ROLAND BRONSON, INDIVIDUALLY AND AS
ADMINISTRATOR OF
THE ESTATE OF JUDY LEE BRONSON

v.

THE HITCHCOCK CLINIC

May 8, 1996

*Abramson, Reis & Brown*, of Manchester (*Randolph J. Reis & a.* on the brief, and *Stanley M. Brown* orally), for the plaintiff.

*Orr and Reno, P.A.*, of Concord (*Ronald L. Snow & a.* on the brief, and *James P. Bassett* orally), for the defendant.

BRODERICK, J. The plaintiff, Roland Bronson, administrator of the estate of Judy Lee Bronson, sued the defendant, the Hitchcock Clinic (the Clinic), alleging medical negligence resulting in the wrongful death of his wife. The jury returned a verdict for the plaintiff. On appeal, the defendant argues that the Superior Court (*Perkins*, J.) erred in denying its motions for directed verdict and for judgment notwithstanding the verdict on several grounds. We affirm.

In November 1985, Mrs. Bronson visited her local physician complaining of shortness of breath and an irregular heartbeat. After ordering an X ray, the physician discovered a "large, poorly defined, anterior mediastinal mass about seven centimeters in diameter" in Mrs. Bronson's chest. She was referred for diagnosis and treatment to the Hitchcock Clinic, where a biopsy was performed on the mass on December 3, 1985. While performing the biopsy, the thoracic surgeon accidentally lacerated Mrs. Bronson's pulmonary artery. Emergency surgery was required to prevent her from bleeding to death.

On February 11, 1986, a team of cancer specialists at the Clinic reviewed Mrs. Bronson's case and collectively concluded that a form of lymphoma was in her "differential diagnosis." They hoped to obtain another tissue sample, however, because they were unable to make a firm diagnosis. The thoracic surgeon who had performed the chest surgery recommended waiting to perform another biopsy on Mrs. Bronson, and the remaining conferees agreed to postpone the biopsy and monitor her condition. During the following three months, Mrs. Bronson's local physician monitored her status. In May she returned to the Clinic because her condition had worsened. On May 14, 1986, the Clinic performed a second biopsy and immediately began treating Mrs. Bronson for Hodgkin's disease. She died of the disease in January 1988.

Roland Bronson, individually, and on behalf of Mrs. Bronson's estate, brought a medical negligence action against the Clinic for failure promptly to diagnose and treat his wife for Hodgkin's

disease, claiming that the defendant's negligence caused her death. The defendant moved for a directed verdict at the close of the plaintiff's case on the ground that the plaintiff had not established a *prima facie* case of medical negligence, arguing that the plaintiff failed to introduce sufficient expert testimony from which the jury could conclude that the defendant's negligence caused Mrs. Bronson's death. The trial court denied this motion. After the jury returned a verdict in favor of the plaintiff, the defendant moved for judgment notwithstanding the verdict and to set aside the verdict. The trial court denied these motions as well.

On appeal, the defendant argues that: (1) the plaintiff introduced insufficient medical expert testimony on the issue of causation to survive a motion for directed verdict or for judgment notwithstanding the verdict; (2) the trial court erred in denying the defendant's motion for partial directed verdict on the plaintiff's "failure to rebiopsy" theory of recovery; (3) the trial court erred in allowing a medical witness to testify about the defendant's failure to treat Mrs. Bronson; (4) the trial court abused its discretion in allowing the plaintiff to compel the videotaped deposition of a medical witness; and (5) the trial court erred in instructing the jury on causation. The plaintiff filed a cross-appeal but declined to brief the issues raised therein. We therefore consider them to be waived. *See Sutliffe v. Sutliffe*, 138 N.H. 404, 406, 640 A.2d 284, 286 (1994).

In an opinion dated September 21, 1994, we reversed. The plaintiff moved for rehearing. *See* SUP. CT. R. 22. We granted the plaintiff's motion, withdrew our opinion, and ordered rebriefing and reargument. We now affirm.

*I. Causation*

The primary issue on appeal is whether the plaintiff introduced sufficient medical expert testimony about causation to survive a motion for directed verdict or a motion for judgment notwithstanding the verdict. For purposes of resolving the causation issue, the defendant concedes that the plaintiff established a duty, breach of that duty, and injury.

Though they are made at different points in a trial, "[m]otions for directed verdict and judgment notwithstanding the verdict are essentially the same, . . . and they are governed by identical standards." *Thompson v. The H.W.G. Group*, 139 N.H. 698, 699, 664 A.2d 489, 490 (1995) (quotation omitted). "Such motions should be granted only when the sole reasonable inference that may be drawn from the evidence, which must be viewed in the light most favorable to the nonmoving party, is so overwhelmingly in favor of the moving party that no contrary verdict could stand." *Id.* (quotation omitted).

■ In a medical negligence action, the plaintiff's burden of proof is defined by statute. *See* RSA 507-E:2, I (Supp. 1995). The plaintiff must prove "by affirmative evidence which must include expert testimony . . . [t]hat as a proximate result [of the defendant's negligence], the injured person suffered injuries which would not otherwise have occurred." RSA 507-E:2, I(c). This statutory standard reflects the plaintiff's burden at common law to produce sufficient evidence that the defendant's negligence proximately caused the patient's injury. *See Pillsbury-Flood v. Portsmouth Hosp.*, 128 N.H. 299, 304, 512 A.2d 1126, 1129 (1986).

■ The concept of proximate cause includes both the cause-in-fact and the legal cause of injury. The parties in this case dispute only whether the plaintiff established that the defendant's negligence was the cause-in-fact of Mrs. Bronson's death. Conduct is the cause-in-fact of an injury if the injury would not have occurred without that conduct. *See North Bay Council, Inc. v. Bruckner*, 131 N.H. 538, 548, 563 A.2d 428, 434 (1989); W. KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 41, at 266 (5th ed. 1984). The plaintiff must produce evidence sufficient to warrant a reasonable juror's conclusion that the causal link between the negligence and the injury probably existed. *See Martin v. Wentworth-Douglass Hosp.*, 130 N.H. 134, 136, 536 A.2d 174, 176 (1987).

The actionable injury here is the death of Mrs. Bronson. Accordingly, we must determine whether — viewing all of the evidence in the light must favorable to the plaintiff — the plaintiff met his burden of producing expert medical testimony that could lead a rational juror to conclude that the defendant's negligent six-month delay in diagnosing and treating Mrs. Bronson for Hodgkin's disease caused or probably caused her death. *See id.*

A review of the expert testimony reflects that the plaintiff asked his medical oncology expert, Dr. Sandra Horning, an associate professor in the department of medicine at Stanford University, what the delay in diagnosis meant to Mrs. Bronson's outlook or outcome. Dr. Horning testified:

> I think in the interval that you described that her stage, if you will, progressed. As I have indicated, I think the more important features are the objective data which show[] that the tumor clearly grew. And I think the records indicate that the patient was in less good shape, if you will, at the time that the chemotherapy and radiotherapy were initiated, by virtue of persistence and increase in her symptoms.

Dr. Horning also testified that the defendant's delay in diagnosis lessened Mrs. Bronson's chances for a curative outcome. Specifically, she stated that in November 1985, Mrs. Bronson's probability of survival "with a combination of chemotherapy and radiation" was "approximately 75 percent," and that it had decreased to "somewhere in the neighborhood of 50 percent" by May 1986. On cross-examination, the defendant asked Dr. Horning: "[A]ll anybody could say in this case is that you believe an earlier diagnosis would have given the patient a better chance of survival statistically, isn't that right?" She answered, "Yes." She was never asked directly whether the defendant's negligence "caused" or "probably caused" Mrs. Bronson's death.

The defendant argues that the plaintiff failed to meet the burden of production on causation because at most his statistical evidence supports the conclusion that Mrs. Bronson is equally likely to have died from pre-existing cancer as from the defendant's negligent delay in diagnosis. The defendant points to the twenty-five percent decrease in Mrs. Bronson's chance of survival and compares it to the twenty-five percent chance she had of not surviving before the failure to diagnose. From this, the defendant concludes that Hodgkin's disease was as equally likely the cause of Mrs. Bronson's death as was the defendant's failure to diagnose and, therefore, that the plaintiff failed to establish that the defendant's negligent delay in diagnosis caused Mrs. Bronson's death. The plaintiff contends that he produced sufficient evidence of cause-in-fact merely by establishing that Mrs. Bronson's statistical probability of survival was seventy-five percent before the negligence occurred.

■ We are not persuaded by either interpretation of the evidence. Each argument incorrectly relies exclusively upon the statistical evidence; though such evidence may form the basis for an opinion on causation, bare percentages alone are insufficient to establish causation. *See Battenfeld v. Gregory*, 589 A.2d 1059, 1064 (N.J. Super. Ct. App. Div. 1991); *Herskovits v. Group Health Co-op.*, 664 P.2d 474, 488-91 (Wash. 1983) (Brachtenbach, J., dissenting). Simply put, the approximate "chances" of survival presented by Dr. Horning do not tell the entire story.

■ As discussed above, "[t]he quantum of [expert testimony] necessary to survive a motion for [a directed verdict must] be enough to warrant the conclusion . . . that the causal link probably existed." *Martin*, 130 N.H. at 136, 536 A.2d at 176. This standard does not require that causation be proved to a statistical certainty. The plaintiff need only show with reasonable probability, not mathematical certainty, that but for the defendant's negligence, the

harm would not have occurred. *See Bell v. United States*, 854 F.2d 881, 889 (6th Cir. 1988).

Though this is a close case, we conclude that the plaintiff met this burden. Dr. Horning reviewed and analyzed Mrs. Bronson's pertinent medical records and history for the period November 1985 to May 14, 1986. She testified that in late 1985 Mrs. Bronson was in an intermediate stage of Hodgkin's disease that was susceptible to treatment within a single radiotherapy port. By May 1986, the disease had spread significantly; as Dr. Horning testified:

> [A]lthough [Mrs. Bronson's] disease was largely confined to her chest, the thorax, it had spread from the mediastinal mass to adjacent areas such as the pericardium, the sac around the heart; the pleural surface; I also believe the lung and chest wall. So that the entire left hemithorax was involved with Hodgkin's disease.

Dr. Horning unequivocally described the disease as "very extensive" in the hemithorax. She stated that her review of Mrs. Bronson's X rays between November 1985 and May 1986 showed an "overall dramatic change i[n] the loss of left lung definition . . . and volume" which she associated with the spread of the disease. By May 1986, Mrs. Bronson's tumor had grown appreciably and extended "down the border of [her] heart," essentially surrounding it. The tumor was so large it had become necrotic.

Defense counsel impliedly asserted during cross-examination of Dr. Horning that the care provided Mrs. Bronson was acceptable because periodic X rays showed little change in the disease during the period February to April 1986. If, in fact, little change was evident, the jury still would have been free to conclude that the dramatic tumor growth detected by Dr. Horning by May 1986 was of recent origin — and, therefore, that had treatment and intervention commenced on or before February 1986, with or without a formal diagnosis of Hodgkin's disease but in advance of the tumor's growth and spread, Mrs. Bronson would likely have survived.

Dr. Horning further testified that the likelihood of dying from Hodgkin's disease is correlated with tumor burden, and though the growth rate is disputed, it is uncontroverted that the tumor grew and spread during the six-month period between initial examination and diagnosis. According to Dr. Horning, as a result of the tumor's growth, Mrs. Bronson "wasn't as healthy" by May 1986 and, therefore, was less likely to respond favorably to chemotherapy, with or without radiation treatment. The oncologist explained: "[A]s tumors divide and grow they acquire resistance to . . . [treatment]." Once a tumor "grows to a certain size, . . . it can no longer

be treated with radiotherapy alone. It [then] requires a combination of chemotherapy and radiation." Dr. Horning also stated that had Mrs. Bronson been timely diagnosed and treated, she would have been able to return to work by the beginning of the next year. Having this evidence before them, reasonable jurors could have concluded that because of the increase in tumor size and her deteriorating health, Mrs. Bronson could not endure full doses of chemotherapy, and that it was because she could not tolerate full doses of chemotherapy that her treatment failed.

■ The defendant nonetheless argues that the plaintiff's expert failed to state that Mrs. Bronson would have survived but for the alleged negligence of the defendant. Though advisable for clarity, recitation by a medical expert of specific words or phrases mirroring statutory language is not essential to establish cause-in-fact in a medical negligence case. *See Sentilles v. Inter-Caribbean Corp.*, 361 U.S. 107, 109 (1959). Expert testimony must be offered to establish cause-in-fact, but there is no single acceptable means by which this can be accomplished: if competent expert medical testimony is adduced from which the jury can fairly and reasonably conclude that but for a defendant's negligence an injury probably would not have occurred, the plaintiff has met his burden.

Here, the plaintiff produced sufficient evidence from which reasonable jurors could find or infer that the defendant's negligence was the cause-in-fact of Mrs. Bronson's death. We recognize that it would not have been unreasonable for the jury to conclude otherwise. At a minimum, however, the inferences that may be drawn from the evidence are not "so overwhelmingly in favor of the [defendant] that no contrary verdict could stand," *Thompson*, 139 N.H. at 699, 664 A.2d at 490 (quotation omitted), and we will not endeavor "to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because [we] feel that other results are more reasonable," *Sentilles*, 361 U.S. at 110 (quotation omitted). "Under our jury system, reasonably disputable issues of fact are to be resolved by the jury . . . ." *Faust v. General Motors Corp.*, 117 N.H. 679, 684, 377 A.2d 885, 888 (1977) (quotation omitted). The trial court did not err in denying the defendant's motions for directed verdict and for judgment notwithstanding the verdict.

*II. "Failure to Rebiopsy" Theory*

The defendant next contends that the trial court erred in denying its motion for a partial directed verdict on the plaintiff's "failure to rebiopsy" theory of recovery. The plaintiff's writ of summons

included two theories: the negligence allegation discussed above, and an allegation that the negligence caused the plaintiff emotional distress. In instructing the jury, the trial court explained the negligence claim in this way:

> Plaintiff claims that the defendant's physicians did not properly treat Mrs. Bronson because they failed to make a timely diagnosis of Hodgkin's disease. The plaintiff claims that the defendant's physicians' improper treatment of Mrs. Bronson caused her death.

> To meet this burden of proof, the plaintiff must prove that the failure to diagnose and treat Hodgkin's disease before May 1986 did more than increase the probability of Mrs. Bronson's death. Rather, what the plaintiff must prove by a preponderance of the evidence is that the failure to diagnose and treat Mrs. Bronson before May 1986 more probably than not caused her death.

The plaintiff's allegation that the defendant should have performed an additional test between the negligent failure to diagnose and the actual diagnosis is simply an aspect of his negligence claim; it is not itself an independent claim in this case. The trial court gave no specific charge regarding the particular findings that the jury would have to make to award recovery on an independent "failure to rebiopsy" theory, and the defendant did not object to the section of the court's charge that included its only reference to such a theory:

> Suffice it to say, for the purposes of these instructions, that the plaintiff[']s claim that the various doctors who were employed by the [defendant] and worked on Mrs. Bronson's problems between early December 1985 and May 1986 were negligent, that their work fell below the required standard of care. In general, this claim takes approximately four theories.

> First, that the defendant's doctors failed to properly interpret the biopsy slides and make a diagnosis of malignancy in early 198[6]. And second, that they failed to send the slides out to others for a further evaluation and diagnosis. Third, that they failed to timely conduct a further biopsy. And fourth, that the delay in treatment plan from December 1985 to May 1986 was inappropriate.

> Plaintiff further claims that these failures directly led to the various damage claims and the ultimate death of [Mrs.] Bronson.

If it considered the "failure to rebiopsy" theory to be an inappropriate matter for jury consideration, the defendant should have objected to any inclusion of or reference to such a theory in the court's instructions. *See Broderick v. Watts*, 136 N.H. 153, 169-70, 614 A.2d 600, 610-11 (1992). Accordingly, we conclude that the trial court did not err when it denied the defendant's motion for a partial directed verdict.

*III. Dr. Horning's Testimony*

▆ The defendant also argues that Dr. Horning should not have been allowed to testify that the defendant's failure to begin treating Mrs. Bronson in December 1985, at the time of the failure to diagnose Hodgkin's disease, was negligent. It contends that Superior Court Rule 35(b)(3)(a)(i) compels the exclusion of this testimony because the plaintiff did not disclose that Dr. Horning would offer an opinion on this precise issue, and because the issue was not discussed during Dr. Horning's deposition. The admission or exclusion of expert testimony is within the trial court's discretion, and we will not reverse the trial court absent a clear abuse of that discretion. *Johnston v. Lynch*, 133 N.H. 79, 88, 574 A.2d 934, 939 (1990).

Superior Court Rule 35(b)(3)(a)(i) provides that

> [a] party may through interrogatories require any other party to identify each person, whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

Pursuant to this rule, the plaintiff provided to the defendant a list of experts he expected to produce to testify. In this list of experts, Dr. Horning was identified as follows:

> Dr. Horning is a medical oncologist. Like Drs. Lewis, Willey, and Wallack, she will testify that the physicians involved in [Mrs.] Bronson's care *negligently failed to establish a diagnosis in a timely fashion.* Had they done so, Mrs. Bronson probably would have survived. Despite the fact that a diagnosis of Hodgkin's disease was not made based upon the 1985 specimen slides, Mrs. Bronson's presentation and history was highly suspicious for malignant lymphoma and the standard of care requires that a diagnosis be established or the patient be referred else-

where for appropriate workup. It was inappropriate to simply monitor the patient after the 1985 [test]. *Affirmative steps should have been taken to establish a diagnosis by obtaining more tissue samples.*

(Emphasis added.)

At Dr. Horning's deposition, defense counsel asked her whether it would breach the standard of care to begin treatment for Hodgkin's disease before there was a confirmed diagnosis of Hodgkin's disease. She responded that treatment should not have been instituted based solely on the pathology report that was rendered at the time, which did not diagnose Mrs. Bronson with Hodgkin's disease. She went on to state that "the leading diagnosis, from a clinical standpoint, would clearly be malignant, malignant, malignant, malignant." When she was asked what Mrs. Bronson's "differential diagnosis" was in December 1985, she replied, "Hodgkin's disease at the top of the list, followed by non-Hodgkin's lymphoma, followed by lung cancer." She was not asked for her opinion about the timely commencement of treatment if the pathology report had been diagnostic of Hodgkin's disease.

At trial, plaintiff's counsel asked Dr. Horning whether, if the tissue from the November 1985 biopsy had been determined to be "malignant, that is it was cancerous, but [the doctors] couldn't tell you whether it was Hodgkin's or non-Hodgkin's, or what, but they could tell you it was definitely malignant, definitely cancerous, should the patient be treated on that basis?" Over objection, she answered,

> A[nswer]: If the pathologists were able to tell me that the tissue [was] definitely malignant, I would press the pathologists to do everything they could to try to further characterize that malignancy. And there are many things that can be done, even if the tissue's in a fixative, to help discriminate between lymphomas and other tumors, or even to discriminate between Hodgkin's disease and non-Hodgkin's lymphoma. And if I knew this were malignant, and further classification had been done, I would be prepared to treat the patient for the malignancy that was diagnosed.

> . . . .

> Q[uestion]: Would the standard of care among cancer specialists require that the patient, under the cir-

cumstances you just described, be treated even though there wasn't a firm diagnosis of Hodgkin's disease?

A[nswer]: I think a patient with a diagnosis of malignancy would be treated.

It is true that during her deposition Dr. Horning did not state her opinion on the precise question asked at trial. The defendant seeks to have us exclude this testimony because it was not discussed, precisely, at the deposition, and because it was not disclosed, precisely, in the plaintiff's list of proposed expert witnesses. We decline to read Rule 35 so narrowly.

"A party is obligated to respond to requests for discovery honestly, fully and responsively." 4 R. WIEBUSCH, NEW HAMPSHIRE PRACTICE, CIVIL PRACTICE AND PROCEDURE § 811 (1984) (quotation omitted); see SUPER. CT. R. 36. In *Welch v. Gonic Realty Trust Co.*, 128 N.H. 532, 517 A.2d 808 (1986), we held that when a defendant merely generally disclaimed liability for a tort action before trial, the trial court erred in allowing the defendant to assert a specific defense at trial. *Id.* at 536, 517 A.2d at 810. We stated that the purposes of New Hampshire's liberal discovery rules would be thwarted if the rules were interpreted to require a party to be "nothing less than clairvoyant." *Id.*

Clairvoyance was not called for in this case. The defendant was aware, from the original writ forward, of the full substance of the plaintiff's case. At Dr. Horning's deposition, she was asked a full range of questions concerning the defendant's failure timely to diagnose *and* to commence treatment of Mrs. Bronson. The omission of *one particular question* bearing on one element of the plaintiff's theory of liability does not render Dr. Horning's trial testimony unfairly surprising. Nor did the testimony compromise the defendant's "strategic position." *Id.* Consequently, we uphold the trial court's admission of Dr. Horning's testimony on this issue.

*IV. Deposition of Dr. John Glick*

The defendant next contends that the trial court abused its discretion when it allowed the plaintiff to compel the videotaped deposition of Dr. John Glick, purportedly for use at trial, and then failed to compel the plaintiff to present the videotape at trial. The defendant notes that the trial court ordered the videotaped deposition of Dr. Glick expressly "for use at trial," characterizing the plaintiff's request for deposition as "not a request for discovery." *See Fenlon v. Thayer*, 127 N.H. 702, 706, 506 A.2d 319, 321 (1986).

The trial court has broad discretion in the management of discovery and the admissibility of evidence. *See, e.g., id.* at 705, 506 A.2d at 321. We will not reverse the trial court's ruling unless there is a clear abuse of that discretion. *Johnston,* 133 N.H. at 88, 574 A.2d at 939.

After the plaintiff chose not to introduce the videotaped deposition as part of his case, the defendant did introduce it. We fail to see how the defendant was prejudiced by the compelled deposition when the defendant used it at trial. The trial court did not abuse its discretion in declining to compel the plaintiff to present the videotaped deposition. *See Fenlon,* 127 N.H. at 706, 506 A.2d at 321.

*V. Jury Instructions*

Finally, the defendant argues that the trial court erred "in repeatedly instructing the jury that it could find for the plaintiff if it determined that the defendant's negligence 'contributed to cause' or 'substantially helped to cause' the decedent's death." The defendant contends that the instructions failed adequately to inform the jury that before addressing the question whether the defendant's alleged negligence was a "substantial factor" in causing Mrs. Bronson's death, it first had to find that the defendant's negligence was the cause-in-fact of her death. We disagree.

Though the trial court must "fully and correctly instruct the jury as to the law applicable to the case," it need not use "the exact words of any party's request." *Rawson v. Bradshaw,* 125 N.H. 94, 100, 480 A.2d 37, 41 (1984) (quotation and emphasis omitted). "[T]he test for determining whether an erroneous civil jury charge is reversible error is whether the jury could have been misled into basing its verdict on a misperception of the law." *Peterson v. Gray,* 137 N.H. 374, 377, 628 A.2d 244, 246 (1993) (quotation and emphasis omitted). We must inquire whether the charge, when viewed in its entirety, "fairly presented the case to the jury in such a manner that no injustice was done to the legal rights of the litigants." *Id.* (quotation omitted).

The principles governing causation require that the defendant's conduct be both the cause-in-fact of the plaintiff's harm and "a substantial factor, rather than a slight one, in producing [that harm]." *North Bay Council, Inc.,* 131 N.H. at 548, 563 A.2d at 434. Here, the trial court instructed the jury both that the defendant had challenged whether its conduct was the cause-in-fact of Mrs. Bronson's death, and that the plaintiff had to prove that the defendant's conduct was the cause-in-fact of the injury. The court also stated the proper New Hampshire standards for causation-in-

fact and legal causation on several occasions during its charge. Taking the charge as a whole, we are persuaded that "it fairly presented the case to the jury in such a manner that no injustice was done to the legal rights of the litigants." *Rawson*, 125 N.H. at 100, 480 A.2d at 41 (quotation omitted).

*Affirmed.*

JOHNSON, J., did not sit; BATCHELDER, J., retired, sat by special assignment under RSA 490:3; HORTON, J., with whom THAYER, J., joined, dissented; the others who sat concurred.

HORTON, J., dissenting: I would reverse the verdict below and grant judgment for the defendant. The trial court should have granted the defendant's motion for directed verdict. The plaintiff failed to elicit the necessary medical testimony to permit the issue of causation to go to the jury.

It is well-settled that "[w]here the cause of disease, injury, or death of a person is not within common knowledge or experience there must be scientific or medical evidence, that is the testimony of medical experts, to establish the cause and effect relationship between the complained of condition and the asserted cause." 31A AM. JUR. 2D *Expert and Opinion Evidence* § 243 (1989); *see Martin v. Wentworth-Douglass Hosp.*, 130 N.H. 134, 136, 536 A.2d 174, 175-76 (1987). The rule requiring expert testimony to establish causation in medical malpractice cases arose "[i]n order that verdicts may not be founded on speculation." *Bentley v. Adams*, 100 N.H. 377, 379, 128 A.2d 202, 204 (1956). No expert testimony was necessary if the facts to be established were "nontechnical matters or those of which an ordinary person may be expected to have knowledge." *Mehigan v. Sheehan*, 94 N.H. 274, 275-76, 51 A.2d 632, 633 (1947). In some cases, the causal connection between an accident and subsequent complaints may be established "either by expert testimony, by inferences which may fairly be drawn from lay testimony or by a combination of the two." *Bentley*, 100 N.H. at 379, 128 A.2d at 204. "There are other situations where the questions are such that *only an expert* may be expected to know about them, and in such cases expert testimony is required." *Id.* (emphasis added). This court has held that explicit expert testimony on the issue of causation is essential "if *any inference* of the requisite causal link must depend on observation and analysis outside the common experience of jurors." *Thorpe v. State*, 133 N.H. 299, 304, 575 A.2d 351, 353-54 (1990) (emphasis added) (quotation omitted). This requirement of our law has been codified in New Hampshire. RSA 507-E:2 (Supp. 1995) requires: "I. In any action for medical injury,

the plaintiff shall have the burden of proving by affirmative evidence which must include expert testimony of a competent witness or witnesses: . . . (c) That as a proximate result thereof, the injured person suffered injuries which would not otherwise have occurred."

In *Burton v. Holden & Martin Lumber Co.*, 20 A.2d 99 (Vt. 1941), one of the leading cases establishing the requirement that an expert testify that the injury was the probable cause of death, the court held that the jury was not entitled to speculate whether the injury that the decedent received actually caused his death even though there was evidence that the decedent was in good health before the injury. *Id.* at 101. The court stated:

> In the instant case the jury cannot, without expert testimony, get at the cause from the other evidence, because the evidence has no tendency to prove to the lay mind a relation of cause and effect. It could not logically find the cause from the expert testimony if the rule in question is applied to restrict expert opinion to what might or could result from the injury, since that does not necessarily go further than a possibility, and a mere possibility does not satisfy the burden of proof.

*Id.* at 101-02 (quotation omitted).

"The quantum of such evidence necessary to survive a motion for nonsuit had to be enough to warrant the conclusion of a reasonable juror that the causal link *probably* existed." *Martin*, 130 N.H. at 136, 536 A.2d at 176 (emphasis added). Other courts have noted, "[a]lthough we approve generally of the 'reasonable medical probability' standard, we also note that no 'talismanic words' are mandatory." *Hammer v. Mount Sinai Hosp.*, 596 A.2d 1318, 1328 (Conn. App. Ct. 1991) (quotation omitted), *cert. denied*, 599 A.2d 384 (1991). "[T]he proper test to be applied is that the expert must, with reasonable certainty, state that in his professional opinion the injuries complained of most probably resulted from the alleged negligence of the defendant." *Billups v. Leliuga*, 398 S.E.2d 75, 77 (S.C. Ct. App. 1990); *see* 3 PROOF OF FACTS, *Causation — Medical Opinion* 161, 161, 163 (1959) (noting that although "medical testimony regularly and expectedly falls below the level of absolute certainty[,]" "[m]ost jurisdictions require medical testimony that the accident 'probably caused plaintiff's injury'"). *But see* Annotation, *Sufficiency of expert evidence to establish causal relation between accident and physical condition or death*, 135 A.L.R. 516, 532-39 (1941) (listing cases that have upheld the sufficiency of evidence as to possibility or probability in conjunction with other

evidence); 31A AM. JUR. 2D *Expert and Opinion Evidence* § 259 (1989).

Repeated review of the record below disclosed the following material evidence. Early in the trial Dr. Horning, the plaintiff's primary expert, was asked the following question:

> Q: Now, do you think that the delay in this case between November or December of 1985 and May of 1986 had any bearing on Judy Bronson's chances of survival?

> A: Yes, I do.

The plaintiff's lawyer then asked Dr. Horning to clarify this opinion.

> Q: And what is your opinion about what that delay meant to her in terms of what her outlook or outcome was?

> A: Well, I think in the interval that you described that her stage, if you will, progressed. As I have indicated, I think the more important features are the objective data which shows that the tumor clearly grew. And I think the records indicate that the patient was in less good shape, if you will, at the time that the chemotherapy and radiotherapy were initiated, by virtue of persistence and increase in her symptoms.

Dr. Horning then proceeded with a lengthy explanation of how during the delay in treatment Mrs. Bronson's condition worsened and the tumor grew in size to the point where she could not withstand the appropriate treatment. Dr. Horning also testified about the standard of care and breach. At the end of this testimony, the plaintiff's attorney asked Dr. Horning to sum up her opinions. First she was asked to sum up with reference to the appropriate treatment in this case. Then she was asked about causation:

> Q: Assuming Judy Bronson had been diagnosed and treated for Hodgkin's disease in either early – I'm sorry, either late 1985 or early 1986, do you have an opinion as to whether or not Judy would have been able to return to work by the beginning of 1987?

> A: I would think it would be reasonable that you could expect that she'd be able to return by that date.

In addition to this testimony there is the testimony regarding the statistical chances of survival discussed in the majority opinion that even the majority recognizes to be insufficient proof of causation.

Is this enough, even with the substantial amount of clinical evidence on tumor growth and intolerance to treatment, to permit the jury to infer that the delay in treatment was, in fact, the cause of the plaintiff's death? In this case, the testimony regarding causation consisted of an acknowledgement that the delay in treatment had some bearing on Judy Bronson's chance of survival and that had she been treated immediately it would be reasonable to expect that she might be able to return to work by 1987. There is no testimony that the delay "probably" or "likely" caused Judy Bronson's death, as the law requires. In fact there is no medical testimony as to the cause of death at all. There is no analysis of the progress of the case from the beginning of treatment to the time of death. At best the testimony can be interpreted to mean that there was some chance that the delay had some indefinite effect on Mrs. Bronson's death. When treatment commenced, the plaintiff's expert opined to a $^{50}/_{50}$ chance of survival. How did the case progress from this point? This is not the degree of certainty required by the law. If the failure to diagnosis Mrs. Bronson earlier probably caused her death, "no reason appears why the physician could not have said so." *Bentley*, 100 N.H. at 379-80, 128 A.2d at 204. To allow the jury to make the inferential leap from Mrs. Bronson's lower chance of survival and worsening condition due to malpractice to Mrs. Bronson's ultimate death would allow the jury to engage in bald speculation. This type of uninformed guesswork is exactly what the common law rule requiring expert testimony in medical malpractice cases and RSA 507-E:2 were intended to prevent. *See Thorpe*, 133 N.H. at 304, 575 A.2d at 353-54; *cf. DiPietro v. Lavigne*, 97 N.H. 474, 476, 92 A.2d 914, 916 (1952). Therefore, I respectfully dissent.

THAYER, J., joins in the dissent.