Grafton
No. 98-426

DONNA ST. PIERRE

v.

STEPHEN ELGERT, M.D.

December 28, 2000

*Edward B. Mulligan, IV,* of Gilford, by brief and orally, for the plaintiff.

*Sulloway & Hollis, P.L.L.C.,* of Concord (*W. Kirk Abbott, Jr.* and *Sarah S. Murdough* on the brief, and *Mr. Abbott* orally), for the defendant.

DALIANIS, J. The plaintiff, Donna St. Pierre, appeals the Superior Court's (*Fitzgerald,* J.) grant of the motion of the defendant, Stephen Elgert, M.D., for directed verdict in her medical negligence case. We reverse and remand.

The following facts are undisputed. On December 10, 1993, the defendant, the plaintiff's physician, delivered the plaintiff's second child. Following the delivery, the plaintiff began to hemorrhage. After examining the plaintiff's uterus, the defendant determined that the placenta had partially separated from the uterus and that the hemorrhaging came from the placental insertion site on the

uterine wall. With the assistance of Pitocin and uterine massage, the plaintiff delivered the placenta. The defendant examined it and determined that there were no "major breaks or tears or anything that looked like it was a missing piece." The placenta was sent to pathology for examination.

On December 14, two days after she was discharged from the hospital, the plaintiff visited the hospital's emergency room. An emergency room doctor placed her on antibiotics to treat a suspected kidney infection. When the plaintiff failed to improve, an ultrasound was done, which indicated that there were possible retained products of conception (*i.e.*, pieces of the placenta). The defendant discussed various options with the plaintiff, including either waiting for the retained materials to pass or doing a dilation and curettage (D&C). The plaintiff had a D&C. A few days later, because the plaintiff continued to bleed and have pain, another doctor performed a second D&C. The second D&C perforated the plaintiff's uterus. Follow-up testing revealed an infection requiring the removal of one of the plaintiff's fallopian tubes.

The plaintiff sued the defendant, alleging that because of his negligence, products of conception remained in her uterus, leading to infection and the removal of a fallopian tube. At the close of the plaintiff's case, the defendant moved for a directed verdict. The trial court granted the defendant's motion and denied the plaintiff's motion for reconsideration.

On appeal, the plaintiff argues that the trial court's directed verdict ruling was in error. We agree.

A motion for directed verdict "should be granted only when the sole reasonable inference that may be drawn from the evidence, which must be viewed in the light most favorable to the nonmoving party, is so overwhelmingly in favor of the moving party that no contrary verdict could stand." *Bronson v. The Hitchcock Clinic*, 140 N.H. 798, 800, 677 A.2d 665, 667-68 (1996) (quotation omitted). "The trial court cannot weigh the evidence or judge the credibility of the witnesses, and, if the evidence is conflicting or several reasonable inferences may be drawn, the motion for a directed verdict should be denied." *Arthur v. Holy Rosary Credit Union*, 139 N.H. 463, 465, 656 A.2d 830, 832 (1995) (quotation and brackets omitted). "In addition, the trial judge's discretion to remove questions of fact from the jury is very limited." *Young v. Clogston*, 127 N.H. 340, 342, 499 A.2d 1007, 1009 (1985).

"This court will uphold a trial court's decision to grant a motion for a directed verdict unless the trial judge abused his or her discretion in determining that no rational juror could find for the

party against whom the motion is filed." *Holy Rosary Credit Union*, 139 N.H. at 465, 656 A.2d at 832.

The plaintiff's burden of proof in a medical negligence action is defined by statute, RSA 507-E:2, I (1997), which

> requires the plaintiff to prove by competent expert testimony the standard of care required of the defendant at the time the medical care was rendered, that the defendant failed to act in accordance with such standard, and that as a proximate result, [the plaintiff] suffered injuries which she would not otherwise have sustained.

*Bissett v. Renna*, 142 N.H. 788, 792, 710 A.2d 404, 406 (1998). Accordingly, we must determine whether, viewing the evidence in the light most favorable to the plaintiff, she met her burden of producing sufficient expert medical testimony from which a reasonable juror could conclude that the defendant breached the relevant standard of care and that his breach proximately caused her injuries. *See Bronson*, 140 N.H. at 801, 677 A.2d at 668.

We first examine the plaintiff's evidence of the relevant standard of care and of the defendant's breach of that standard. The plaintiff presented one expert to meet her burden who, on direct examination, testified:

> Q. Now, after the placenta's been delivered, what is the standard — general standard of reasonable medical practice pertaining to the examination of the placenta? And I want you to tell me whether or not that standard was different in 1993 from what it is today.

> A. Sure. I don't — first of all, the standard has been not different for as long as I can remember. The placenta, delivery of the placenta, is an old thing that's gone on ever since people have been born, and we've known for a long time that the placenta can cause some trouble if it isn't delivered intact. So once the placenta has been delivered or born, if you will, the obstetrician or the physician doing the delivery has the obligation to make sure that it's all there.

> . . . .

> So to complete a delivery, the doctor who does that . . . has to be certain that the entire placenta has been totally . expelled from the mother.

> . . . .

Q. Do you have an opinion, Doctor, based upon your background and experience, your review of the record and what you just expressed concerning whether [the defendant's] examination of the placenta was a deviation from the standard reasonable medical practice for a family physician under these circumstances and at this time?

A. Well, I can't — I can't speak to exactly what his examination consisted of because I don't know that. I didn't read his deposition. But it's clear that there was a piece left. I think that speaks for itself to know that there were retained products. And so clearly, whatever examination he did was inadequate because he missed a piece. That's as much as I can say about that.

On cross-examination, the expert testified:

Q. Now, you're not saying every time that there — you have confirmed the presence of retained products by ultrasound that that means you must have negligently failed to observe in the first instance that there was missing placental tissue when you inspected the placenta, are you?

A. No. I think just missing it, you know, it depends on how it was inspected, how it was examined. Negligence has not to do with not finding it. It's got to do with how you did it.

Q. Well, so one could do a perfectly reasonable and careful exam and still fail to detect missing placental tissue in the absence of negligence?

A. It's possible. It's possible. Not probable I must say. Most of the time it's because it was an inadequate exam.

The defendant contends, and the trial court agreed, that because the expert testified that the standard of care is determined by the method of inspecting the placenta, and he did not know how the defendant examined the placenta, no reasonable jury could find that the standard of care was breached.

We do not agree that this is the sole reasonable inference to be drawn from the expert's entire testimony. On direct, the expert testified that the standard of care requires a doctor to make sure that the placenta is completely expelled from the mother and that the defendant breached this standard because he "missed a piece." On cross-examination, the expert reiterated that "most of the time," the failure to detect missing placental tissue is due to negligence.

While we do not presume negligence, as a matter of law, from the fact that the plaintiff's uterus retained placental tissue, the expert testified, as a matter of fact, that the standard of care requires this presumption. Given this testimony, which was sufficient to satisfy the plaintiff's burden under RSA 507-E:2, I, a reasonable juror could conclude that the defendant breached the relevant standard of care.

While it may appear that the expert articulated two contradictory standards of care, one that requires a physician not to miss any retained products of conception and another that depends upon how the physician examines the placenta, it was for the jury to resolve any such conflict. "The jury may accept some parts and reject other parts of testimony, and adopt one or the other of inconsistent statements by witnesses. The defendant's argument that the case should have been taken from the jury because of alleged inconsistency in [the expert's] testimony is without merit." *Morrill v. Tilney*, 128 N.H. 773, 778, 519 A.2d 293, 296 (1986) (citation omitted). We conclude, therefore, that the inferences that may be drawn from the expert's testimony are not "so overwhelmingly in favor of the defendant that no contrary verdict could stand." *Bronson*, 140 N.H. at 804, 677 A.2d at 670 (quotation and brackets omitted).

We next turn to the question of causation. The trial court ruled that the plaintiff did not offer sufficient expert testimony that the defendant's failure to diagnose retained products of conception caused her infection. This conclusion was also erroneous.

"[I]f competent expert medical testimony is adduced from which the jury can fairly and reasonably conclude that but for a defendant's negligence an injury probably would not have occurred, the plaintiff has met [her] burden." *Id.* Here, the expert testified:

> Q. Based upon your diagnosis, review and analysis of the record, background and experience, Doctor, do you have an opinion based upon reasonable medical probability whether [the defendant]'s failure to recognize that there were products of conception retained in [the plaintiff's] uterus caused [her] condition?
>
> A. I think that's so, yes.

The expert also opined that the plaintiff's infection "was instigated and started by the retained tissue" and that "the presence of retained tissue was the result of not recognizing that it was retained initially and not removing it . . . [b]y [the defendant],

who delivered the placenta." This was sufficient testimony from which reasonable jurors could find or infer that the defendant's negligence caused the plaintiff's infection. The plaintiff thus established "the quantum of expert testimony necessary to survive a motion for a directed verdict." *Id.* at 802, 677 A.2d at 669 (brackets and quotation omitted). The emergency room doctor's failure to detect retained products two days after delivery arguably may have contributed to the plaintiff's injuries, but did not extinguish the defendant's role. *See Pridham v. Cash & Carry Bldg. Center, Inc.*, 116 N.H. 292, 297, 359 A.2d 193, 197 (1976).

The plaintiff also argues that the defendant breached the standard of care in two other ways: (1) by giving her the options of having a D&C or waiting to see if the retained products passed; and (2) by failing to remove all of the retained products during the first D&C. In light of our ruling above, we need not address these issues.

*Reversed and remanded.*

HORTON, J., sat for oral argument but retired prior to the final vote; THAYER, J., sat for oral argument but resigned prior to the final vote; BROCK, C.J., and BRODERICK and NADEAU, JJ., concurred; NADEAU and DALIANIS, JJ., took part in the final vote by consent of the parties.