Grafton
No. 2004-708

SHERRY HALL *& a.*

v.

DARTMOUTH HITCHCOCK MEDICAL CENTER *& a.*

Argued: January 11, 2006
Opinion Issued: April 25, 2006

*McKean, Mattson and Latici, P.A.*, of Gilford (*Edgar D. McKean, III* and *Steven M. Latici* on the brief, and *Mr. Latici* orally), for the plaintiffs.

*Orr & Reno, P.A.*, of Concord (*Ronald L. Snow* and *Roy S. McCandless* on the brief, and *Mr. Snow* orally), for the defendants.

DALIANIS, J. The plaintiffs, Sherry and Brad Hall, sued the defendants, Dartmouth Hitchcock Medical Center (DHMC), T.K. Mohandas, Ph.D. and Dartmouth College, alleging negligence resulting in the wrongful birth of their son who was born with a rare chromosomal disorder. The jury returned a verdict for the plaintiffs only on their claim against DHMC. On appeal, DHMC argues that the Superior Court (*Houran*, J.) erred in denying its motions for directed verdict, judgment notwithstanding the verdict, and to set aside the verdict. We reverse.

*I. Background*

The jury could reasonably have found the following facts. Sherry Hall learned she was pregnant in December 2000. In March 2001, after initial screening disclosed that the fetus carried an elevated risk for Trisomy 18, Wendy Wilson, Hall's primary prenatal care provider and a certified nurse midwife, referred her to DHMC for genetic counseling. A "trisomy" is a chromosomal disorder in which there is an extra copy of one or more chromosomes in a person's cell structure.

On March 7, 2001, the plaintiffs met with Valerie Hani Lacroix, a certified genetic counselor at DHMC, and Emily Baker, M.D., a DHMC physician, board-certified in maternal-fetal medicine. At that point, Hall was between sixteen and seventeen weeks of gestation. An ultrasound conducted that day revealed a normal fetal morphology, with the exception of continually clenched hands—a marker for Trisomy 18. As a result, Baker and Lacroix recommended an amniocentesis to provide further information about the condition of the fetus. Hall told Lacroix that she would terminate her pregnancy if the testing revealed any chromosome abnormalities. Baker withdrew amniotic fluid from Hall for analysis by Mohandas' cytogenetics laboratory at DHMC. Hall was aware that it would be at least two weeks before any results would be obtained. She told

Lacroix on March 15, 2001, that she wanted to terminate her pregnancy, but Lacroix advised her to wait for the results of the amniocentesis before making a final decision.

The cytogenetics laboratory processed the amniotic fluid and created a karyotype of the fetus's chromosomes. A "karyotype" is a digital image of each of the twenty-three pairs of chromosomes, segregated and aligned in numerical order. Each chromosome consists of two segments: a long arm (the "q" arm) and a short arm (the "p" arm). Mohandas, another Ph.D. cytogeneticist and a cytotechnician examined the chromosomes for structural abnormality, and then issued a report indicating "karyotype characteristics of a normal male." Trisomy 18 was ruled out. On March 20, 2001, Lacroix called the plaintiffs to deliver the results and said, "Congratulations, you have a normal, healthy baby boy." Lacroix explained that clenched hands were often indicative of a "simian crease," a single crease across the palm of the hand, which the plaintiffs understood to be of no genetic significance. As a result of the normal karyotype report, the plaintiffs were no longer "talking about termination."

The plaintiffs returned to DHMC on March 27, 2001, for a follow-up ultrasound, which again revealed persistently clenched hands and, in addition, a possible "rocker bottom" foot, a congenital deformity in which the foot exhibits a convex, rocker-like shape. Lacroix reviewed the ultrasound and then, due to her elevated level of concern, issued an order to the laboratory to save any remaining amniotic fluid. She did not share this information with the plaintiffs. No member of the DHMC genetic counseling team contacted the plaintiffs regarding the results of the March 27, 2001 ultrasound. The plaintiffs also did not contact DHMC to obtain the results.

The plaintiffs next heard from DHMC to schedule another ultrasound. Following the ultrasound on April 24, 2001, the plaintiffs met with Michelle Lauria, M.D., a DHMC physician, board-certified in maternal-fetal medicine. At the time of the meeting, Hall was between twenty-three and twenty-four weeks of gestation, and was still in her second trimester of pregnancy. DHMC would perform abortions only up to twenty-two weeks of gestation. Termination services were available on demand and without proof of medical necessity in Boston, however, up to twenty-four weeks of gestation.

At that meeting, Lauria reported to the plaintiffs that, in addition to the continually clenched hands and possible rocker bottom foot, the fetus exhibited additional problems on the ultrasound, including lower micrognathia—which is an unusually small lower jaw, a small umbilical vein varix, which is an out-pouch of the umbilical vein, possible heart problems and "lemon head deformity," a convexity in the frontal portion of

the head which can suggest an underlying brain abnormality. During that discussion, Lauria described a broad range of potential outcomes, ranging from a "very minor problem that perhaps would require some physical therapy or maybe some surgery, all the way to being just severely affected, dying at birth or being severely mentally retarded."

Without discussing termination of the pregnancy, Hall immediately decided to transfer her medical care to providers in Boston. Nevertheless, Lauria recommended, and Hall agreed, that DHMC would test the remaining amniotic fluid for Smith-Lemli Opitz (SLO) disease, which, if positive, would account for the syndromic features seen on the ultrasound and indicate a significant probability of mental retardation or neonatal demise. On April 26, 2001, Hall had another ultrasound at Massachusetts General Hospital (MGH) in Boston. Thomas Shipp, M.D., an MGH physician, board-certified in maternal-fetal medicine, interpreted the ultrasound as showing clenched hands but did not detect the other problems reported at DHMC. On April 30, 2001, DHMC reported the results from the SLO test as negative.

On May 2, 2001, Hall met with Louise Wilkins-Haug, M.D., the medical director of the Center for Fetal Medicine of Brigham & Women's Hospital in Boston and a board-certified geneticist. Ultrasound studies at Brigham & Women's Hospital showed persistently clenched hands and significant micrognathia but did not detect the other problems reported at DHMC. Hall elected to carry the fetus to term.

On July 25, 2001, Brandon Hall was born at Brigham & Women's Hospital with multiple, severe congenital anomalies. A sample of blood was withdrawn from the umbilical cord and sent to the cytogenetics laboratory for analysis. The requisition form requested chromosomal analysis of the cord blood sample and "FISH" analysis, a molecular test using fluorescent probes singular to specific chromosomes. Since the laboratory was aware that the child was born with multiple congenital defects, Mary Sandstrom, Ph.D., a cytogeneticist at Brigham & Women's Hospital, acknowledged that the laboratory had a heightened degree of suspicion of chromosomal anomalies, and they were "looking carefully for something abnormal." Sandstrom initially conducted FISH analysis on uncultured cells, but that analysis produced no information concerning chromosomal anomalies. Sandstrom then conducted a microscopic analysis of the karyotype, and reported that Brandon's #15 chromosome was a normal variant, even though its "p" arm appeared to be somewhat longer than usual. Given the length of the variation, Sandstrom called for parental blood samples.

Following chromosome analysis of cells cultured from Brad Hall's blood sample, Sandstrom concluded that he had a "balanced translocation" between his #9 and #15 chromosomes—that is, a small portion of the "q"

arm of his #9 chromosome had translocated to the "p" arm of his #15 chromosome. Because this translocation was "balanced," Brad Hall did not suffer from physical or mental impairment, as there was no extra or missing genetic material in his cells. Upon further analysis of Brandon's karyotype, Sandstrom concluded that the child had inherited one-half of his #9 and #15 chromosomes from his father (with the extra material from #9 attached to #15), and the other half of his #9 and #15 chromosomes from his mother (with no missing material), producing an "unbalanced" translocation, and leading to a diagnosis of Partial Trisomy 9q. This diagnosis was more than extremely rare; it was the *first* reported occurrence of this particular configuration of chromosomal abnormality.

In late 2003, the plaintiffs brought a wrongful birth claim against Mohandas, Dartmouth College in its capacity as Mohandas' employer, and DHMC. A wrongful birth claim is a claim brought by the parents of a child born with severe defects against a medical care provider who negligently fails to inform them, in a timely fashion, of an increased *possibility* that the mother will give birth to such a child, thereby precluding an informed decision as to whether to have the child. *Smith v. Cote*, 128 N.H. 231, 236 (1986).

The plaintiffs alleged that Mohandas was medically negligent in reporting Brandon's genetic karyotype as normal, when, in fact, the karyotype showed the Partial Trisomy 9q chromosomal abnormality, and in failing to recommend and perform additional genetic testing. The plaintiffs also alleged that the DHMC genetic counseling team was medically negligent in failing to provide timely, complete and accurate information about the results of the genetic testing performed, and in failing timely to provide options for further testing, such that the plaintiffs were precluded from making an informed decision as to whether to terminate Hall's pregnancy.

The trial court denied the defendants' motion for directed verdict at the close of the plaintiffs' case and, again, at the close of evidence. The jury returned a verdict in favor of Mohandas and Dartmouth College. The jury found against DHMC, however, and awarded the plaintiffs damages in the amount of $2.3 million. The trial court denied DHMC's post-verdict motions for judgment notwithstanding the verdict and to set aside the verdict. This appeal followed.

*II. Issues on appeal*

On appeal, DHMC argues that the trial court erred in denying its motion for directed verdict and post-verdict motions because: (1) DHMC met the disclosure requirements set forth in *Smith* by informing the plaintiffs in a timely fashion of an increased possibility that Hall would

give birth to a child with serious birth defects, after which the plaintiffs decided not to terminate the pregnancy; and (2) the plaintiffs failed to produce sufficient expert testimony to link DHMC's negligence to the failure to provide a definitive diagnosis of the child's rare chromosomal disorder.

*A. Disclosure requirements*

The first issue on appeal is whether the plaintiffs introduced sufficient evidence that DHMC failed to meet the disclosure requirements set forth in *Smith* to survive a motion for directed verdict or post-verdict motions.

Though they are made at different points in a trial, motions for directed verdict and judgment notwithstanding the verdict are essentially the same, and they are governed by identical standards. *Bronson v. The Hitchcock Clinic*, 140 N.H. 798, 800 (1996). Such motions should be granted only when the sole reasonable inference that may be drawn from the evidence, which must be viewed in the light most favorable to the nonmoving party, is so overwhelmingly in favor of the moving party that no contrary verdict could stand. *Id.* A court may set aside a jury verdict if it was conclusively against the weight of the evidence or if it was the result of mistake, partiality or corruption. *Keeler v. Banks*, 145 N.H. 558, 559 (2000); *Broderick v. Watts*, 136 N.H. 153, 162 (1996). "Conclusively against the weight of the evidence should be interpreted to mean that the verdict was one no reasonable juror could return." *Keeler*, 145 N.H. at 559.

A wrongful birth claim is a form of a medical malpractice action. *See Smith*, 128 N.H. at 233, 242. In a medical malpractice action, the plaintiff must prove by affirmative evidence, which must include *expert testimony* of a competent witness or witnesses:

> (a) The standard of reasonable professional practice in the medical care provider's profession or specialty thereof, if any, at the time the medical care in question was rendered; and
>
> (b) That the medical care provider failed to act in accordance with such standard; and
>
> (c) That as a proximate result thereof, the injured person suffered injuries which would not otherwise have occurred.

RSA 507-E:2, I (1997). The trial court followed RSA 507-E:2 by instructing the jury that the plaintiffs had to prove each element through expert testimony and by a preponderance of the evidence.

In *Smith*, we recognized for the first time that parents of a child born with severe defects could maintain an action for wrongful birth where a

medical care provider negligently failed to inform them, in a timely fashion, of an increased possibility that the mother would give birth to such a child, thereby precluding an informed decision as to whether to have the child. *Smith*, 128 N.H. at 236, 242. We noted that this standard did "not require a physician to identify and disclose every chance, no matter how remote, of the occurrence of every possible birth 'defect,' no matter how insignificant." *Id.* at 240. We further recognized that proof of causation was furnished if the plaintiff could show that, "but for the defendants' negligent failure to inform her of the risks of bearing a child with birth defects, she would have obtained an abortion." *Id.* at 240-41. Finally, we stated that the injury in a wrongful birth claim was the "negligent invasion of the parental right to decide whether to avoid the birth of a child with congenital defects." *Id.* at 242.

The trial court followed *Smith* nearly verbatim in its instructions to the jury concerning the sufficiency of DHMC's disclosure, stating:

> A Defendant is not liable if such Defendant provided the Plaintiffs with the type of information that a reasonable provider of the same specialty would provide under the circumstances about the increased risk and the possibility that the Plaintiffs' child would be born with severe birth defects.

The trial court also followed *Smith* in its instructions on the element of causation:

> [I]f Sherry Hall did timely know, or reasonably could be expected to have timely known, that there was an increased possibility that her child would be born with severe birth defects, or if she would have continued the pregnancy regardless of the information provided to her by the Defendants ... then the Defendants cannot be found liable.

### 1. Sufficiency of DHMC's disclosure

We first review whether the plaintiffs proved, through expert testimony and by a preponderance of the evidence, that DHMC disclosed insufficient information to meet the requirements under *Smith*. Viewing all of the evidence in the light most favorable to the plaintiffs, we must determine whether they met their burden of producing expert testimony that could lead a reasonable juror to conclude that DHMC failed to inform the plaintiffs of an increased possibility that Hall would give birth to a child with serious birth defects. We conclude that plaintiffs did not present sufficient expert testimony to satisfy their burden.

The plaintiffs met with Lauria following an ultrasound on April 24, 2001. It is undisputed that, at that meeting, Lauria reported to the plaintiffs that the fetus had exhibited problems on the ultrasound, including micrognathia, clenched hands, small vein varix, a possible "rocker bottom" foot, "lemon head deformity," and potential heart problems. It is also undisputed that, during that discussion, Lauria described a broad range of potential outcomes, ranging from a "very minor problem that perhaps would require some physical therapy or maybe some surgery, all the way to being just severely affected, dying at birth or being severely mentally retarded." Lauria testified that she told the plaintiffs that there was an approximately ninety-five percent chance of some abnormality. Both plaintiffs acknowledged at trial that Lauria informed them of the increased risk that their child would suffer from serious birth defects. Brad Hall even agreed that there was "absolutely no question" that Lauria made such a disclosure.

The plaintiffs counter, however, that the "mere fact that DHMC reported to the Halls the potential for serious birth defects is not dispositive of the negligence claim." They contend that *Smith* requires a medical care provider to disclose, in essence, whatever information a parent subjectively needs to make an "informed decision" concerning the termination of a pregnancy. Specifically, they argue that DHMC was obligated to discover and disclose a specific diagnosis to the plaintiffs since they were not willing to terminate the pregnancy based upon "mere possibilities" that their child would suffer from serious birth defects. We disagree with the plaintiffs' construction of *Smith*. *Smith* required DHMC to disclose to the plaintiffs only the increased *possibility* that their child would suffer from serious birth defects. *See Smith*, 128 N.H. at 236.

The plaintiffs did not introduce any expert testimony to establish that DHMC failed to disclose to the plaintiffs the increased possibility that their child would suffer from serious birth defects. Rather, Maimon Cohen, Ph.D., the plaintiffs' only expert on genetic counseling at trial, agreed that Lauria made such a disclosure. At least one defense expert also testified that Lauria advised the plaintiffs on April 24, 2001, of an increased possibility that Hall could give birth to a child with severe defects.

The plaintiffs also argue that the April 24, 2001 disclosure was insufficient because the information regarding the increased possibility of birth defects was offset by Lauria's recommendation for the SLO test. Specifically, the plaintiffs contend that the jury reasonably could have accepted Brad Hall's testimony that he understood that the possibilities of mental retardation and neonatal demise were related exclusively to a diagnosis of SLO disease. We decline to extend *Smith* further than the

standard set forth above, however, and thus Brad Hall's testimony does not alter our conclusion.

■ In addition, the plaintiffs argue that the disclosure was insufficient because Lauria did not initiate a discussion with them concerning the option of terminating the pregnancy. Brad Hall testified that DHMC should have told them: "This is what's wrong with your baby and you need to consider termination." The plaintiffs cite no authority to support this contention, and we decline to read that requirement into the standard set forth in *Smith*. We also note that the plaintiffs did not initiate a discussion with Lauria concerning the option of termination. Instead, they immediately transferred their medical care to providers in Boston.

Accordingly, viewing all of the evidence in the light most favorable to the plaintiffs, we conclude that the plaintiffs failed to produce expert testimony that could lead a reasonable juror to conclude that DHMC failed to inform the plaintiffs of an increased possibility that Hall would give birth to a child with serious birth defects. As such, the sole reasonable inference that may be drawn from the evidence is so overwhelmingly in favor of the conclusion that DHMC's disclosure was sufficient that no contrary conclusion could stand.

### 2. Timeliness of DHMC's disclosure

In its order, the trial court did not reach the issue of whether the information provided by Lauria on April 24, 2001, was sufficient under *Smith*. The trial court reasoned that, even assuming that the disclosure was sufficient, the jury reasonably could have determined that the disclosure was not timely. The trial court stated that it was undisputed that abortions were available at DHMC only up to twenty-two weeks of gestation, and that the meeting between the plaintiffs and Lauria occurred when Hall was at twenty-three weeks of gestation. It also acknowledged an apparent conflict in testimony concerning when and under what circumstances abortions were available elsewhere after twenty-two weeks. The trial court found that "there was conflicting evidence as to whether pregnancy termination services were available to the Halls as of April 24, 2001 based upon the ultrasound findings." That finding, however, has no support in the record.

■ At trial, the plaintiffs had the burden of producing expert testimony, see RSA 507-E:2, I, that could lead a reasonable juror to conclude that DHMC failed to make its disclosure to the plaintiffs in a "timely" fashion. In reviewing this issue, the trial court relied explicitly upon the testimony of Dr. Cohen, the plaintiffs' expert on genetic counseling. It stated that: "Dr. Cohen ... testified to the effect that, given the clinical picture as it

existed as of April 24, 2001, with no specific genetic diagnosis, he did not know of any place which would have performed a termination at that time." Cohen, however, in turn, relied specifically upon an erroneous factual premise that a woman could obtain an abortion in Boston only up to twenty-two weeks of gestation. There was no dispute that as of April 24, 2001, Hall was still in her second trimester of pregnancy and termination services were available in Boston. Cohen testified only that Hall would have required a "real diagnosis of a specific genetic disease" if she were seeking an abortion *beyond* the permissible time limitation. It would have been unreasonable for a juror to construe Cohen's testimony to suggest otherwise. All other conflicting, and inconclusive, expert testimony concerning Hall's ability to obtain an abortion, given the clinical situation as of April 24, 2001, related exclusively to her *third* trimester options.

In *Smith*, we were called upon only to decide whether to recognize wrongful birth as a cause of action under New Hampshire law. *Smith*, 128 N.H. at 235. We acknowledged that a disclosure of an increased possibility of birth defects is "timely" if it allows for the opportunity to make an "informed decision as to whether to have the child." *Id.* at 236. We have not reviewed a wrongful birth action since *Smith*, and, thus, have not had occasion to examine the requirement of timeliness in further detail.

Under *Smith*, it was the plaintiffs' burden to prove untimeliness. Given the close proximity of DHMC's disclosure to the end of Hall's second trimester, the plaintiffs needed to demonstrate at trial, by means of expert testimony, that DHMC could have disclosed the same information concerning the increased possibility of birth defects *earlier*. *Cf. Giberson v. Panter*, 286 A.D.2d. 217 (N.Y. App. Div. 2001) (holding that physicians could not be liable for their failure to diagnose certain fetal defects from sonograms at twenty weeks of gestation, where those conditions could not be detected until after birth). The record reveals no such evidence. Specifically, the plaintiffs did not present any expert testimony to establish that DHMC could have provided to the plaintiffs the same clinical diagnosis prior to April 24, 2001, or that DHMC breached its standard of care by failing to conduct another ultrasound at an earlier time. Thus, the jury could not reasonably have found that DHMC could have disclosed the same information concerning the increased possibility of birth defects earlier. In addition, the plaintiffs did not offer any expert testimony to establish that Hall could *not* have terminated her pregnancy within the small period of time remaining in her second trimester.

We note that in determining whether a disclosure was "timely" in a wrongful birth action, a fact finder should consider, among other things, expert testimony concerning the proximity of the disclosure to the end of

the plaintiff's second trimester; expert testimony about whether the medical providers could have earlier disclosed information concerning the increased possibility of birth defects; the practicability of scheduling an abortion to occur prior to the expiration of the second trimester, taking into account whether a medical provider reasonably would have performed the procedure within such a timeframe; the availability of third trimester abortions in other jurisdictions; the requirements for obtaining a third trimester abortion in other jurisdictions; and whether the plaintiff's clinical situation, at the time of the disclosure, would have met such requirements. In accordance with RSA 507-E:2, the plaintiff has the burden to present such expert testimony. RSA 507-E:2, I; cf. *Davis v. Bd. of Sup'rs of L.A. State Univ.*, 709 So. 2d 1030, 1035 (La. Ct. App.), *cert. denied*, 719 So. 2d 1288 (La. 1998) (dismissing a wrongful life claim where the parents failed to present any expert testimony that termination services were unavailable at twenty-three weeks of gestation, when the physician informed them of a significant risk that their child would be born with a birth defect).

■ We also acknowledge that a wrongful birth claim is unlike any other medical malpractice action because it involves the uniquely personal choice to terminate a pregnancy or give birth to a child with the increased possibility of severe birth defects. In this respect, a fact finder should also consider the plaintiff's emotional and physical ability to digest and act upon the information concerning the increased possibility of birth defects within the time period at issue, as well as her willingness and ability to travel to another jurisdiction to obtain an abortion during her third trimester, had she been able to arrange one.

■ In light of the plaintiffs' failure to offer any expert evidence that DHMC could have disclosed the same information concerning the increased possibility of birth defects earlier and in light of the plaintiffs' failure to establish that Hall could not have terminated her pregnancy within the period of time remaining in her second trimester, the sole reasonable inference that may be drawn from the evidence, viewed in the light most favorable to the plaintiffs, is so overwhelmingly in favor of the conclusion that the April 24, 2001 disclosure was timely that the trial court's finding to the contrary cannot stand. As a result, the trial court erred in denying DHMC's motion for directed verdict and post-verdict motions.

### B. Sufficiency of expert testimony

Finally, DHMC argues that the trial court erred in denying its motion for directed verdict and post-verdict motions because the plaintiffs did not

establish through non-speculative expert testimony that, but for the DHMC genetic counseling team's negligence, more probably than not, the child's rare chromosomal disorder would have been diagnosed, such that the plaintiffs would have had the information they claim they needed to determine whether to terminate the pregnancy.

Although DHMC concedes for purposes of this appeal that the genetic counseling team failed to meet its standard of care, the expert testimony, nevertheless, established that DHMC informed the plaintiffs of an increased possibility that Hall would give birth to a child with severe defects. In light of our conclusion that *Smith* required DHMC to disclose only the increased *possibility* of birth defects, we need not address whether the plaintiffs provided sufficient expert testimony to link DHMC's professional negligence to its failure to diagnose the rare genetic disorder.

*Reversed.*

DUGGAN and GALWAY, JJ., concurred.