Hillsborough-northern judicial district
No. 97-860

CHERYL L. POWELL

v.

CATHOLIC MEDICAL CENTER & a.

March 21, 2000

8

*Brennan, Caron, Lenehan & Iacopino*, of Manchester (*Ronald J. Caron* on the brief and orally), for the plaintiff.

*Wadleigh, Starr, Peters, Dunn & Chiesa*, of Manchester (*Robert E. Murphy, Jr.* and *Todd Hathaway* on the brief, and *Mr. Murphy* orally), for defendant Catholic Medical Center.

*Nelson, Kinder, Mosseau & Gordon, P.C.*, of Manchester (*Peter W. Mosseau* and *Elaine M. Michaud* on the brief, and *Mr. Mosseau* orally), for defendant.

BROCK, C.J. The defendants, Catholic Medical Center (CMC) and Lynn Curtis, M.D. (Dr. Curtis), appeal from a judgment of the Superior Court (*Sullivan,* J.) entered on a jury verdict for the plaintiff, Cheryl L. Powell. The defendants contend that the trial court erroneously: (1) ruled that RSA 329:31 (1995) did not preempt the plaintiff's common law claim of duty to warn; (2) instructed the jury regarding that common law duty; (3) failed to require expert testimony on the physician's duty to warn; and (4) admitted into evidence medical reports that post-dated the underlying assault involved in this action. We affirm.

On June 8, 1993, a seventy-six-year-old patient was admitted into the rehabilitation medicine unit (RMU) at CMC after suffering a stroke. At the time of his admission, the patient suffered from memory problems, confusion, fluctuating mental status, multiple skin lesions, and partial paralysis on his left side. Dr. Curtis, medical director of the RMU, was the patient's treating physician and examined him daily. Progress reports for the period prior to the assault show that the patient was "lunging forward and pushing

away" and becoming agitated. Other reports prior to the assault state that the patient was "very restless requiring 1:1 supervision for safety," reported to be banging into people with his wheelchair, threatening to kick and/or hit, and pushing nurses and therapists aside.

The plaintiff, a phlebotomist employed by New Hampshire Medical Laboratories (NHML), was under contract to draw blood samples from patients throughout CMC. The plaintiff drew blood from the patient on June 11 and 17 without incident. On June 19, the plaintiff attempted a routine blood draw from the patient. The patient assaulted her, causing injury to her left arm. The plaintiff received no warning regarding the patient's violent propensities prior to the assault.

The plaintiff brought suit, alleging that both CMC and Dr. Curtis breached their duty to warn her of the patient's potentially assaultive behavior about which the defendants knew or should have known. The jury returned a verdict for the plaintiff and apportioned liability between CMC and Dr. Curtis. Both defendants moved for judgment notwithstanding the verdict. The trial court denied these motions, and this appeal followed.

*I. RSA 329:31*

The defendants first argue that the plaintiff's common law duty to warn claim was preempted by RSA 329:31. The trial court found that the statute did not apply because the patient did not communicate an intent to harm a reasonably identifiable victim.

"The interpretation of a statute is to be decided ultimately by this court." *Petition of Walker*, 138 N.H. 471, 474, 641 A.2d 1021, 1024 (1994). We begin "by examining the plain language of the statute using the ordinary meanings of the words to determine legislative intent." *Id.*

RSA 329:31 states:

I. A physician licensed under this chapter has a duty to warn of, or to take reasonable precautions to provide protection from, a client's violent behavior when the client has communicated to such physician a serious threat of physical violence against a clearly identified or reasonably identifiable victim or victims, or a serious threat of substantial damage to real property.

II. The duty may be discharged by, and no monetary liability or cause of action may arise against, a physician

licensed under this chapter if the physician makes reasonable efforts to communicate the threat to the victim or victims, notifies the police department closest to the client's or potential victim's residence, or obtains civil commitment of the client to the state mental health system.

III. No monetary liability and no cause of action may arise concerning client privacy or confidentiality against a physician licensed under this chapter for information disclosed to third parties in an effort to discharge a duty under paragraph II.

IV. For purposes of this section, "physician" shall include persons providing treatment under the supervision of a physician licensed under this chapter.

The defendants argue that because the statute dictates when a physician may be held liable for failing to warn a third party of the violent potential of his patient, the statute preempts the common law duty to warn claim. The defendants base their argument on *Tarasoff v. Regents of University of California*, 551 P.2d 334 (Cal. 1976), and its progeny.

In *Tarasoff*, the California Supreme Court held that a psychotherapist, having determined under professional standards that a patient posed a threat of serious danger of violence, had a duty to use reasonable care to protect the identified victim. *See id.* at 345. *Tarasoff* is distinguishable from this case. The facts in *Tarasoff* involve a patient who confided in his psychotherapist his intent to kill an identified female friend. *See id.* at 339. The patient murdered the friend, and the victim's family brought suit against the psychotherapist for failing to take steps to protect the victim. *See id.* at 340. Thus, the patient vocalized an intent to harm an identified victim, a situation that may be governed by RSA 329:31. In this case, the patient did not communicate an intent to harm an identified or identifiable victim. In fact, CMC concedes that at no time did the patient communicate a threat of physical violence regarding any specific staff member. The patient may have been a threat, but he did not communicate that threat. As such, neither RSA 329:31 nor *Tarasoff* applies.

A plaintiff may not raise a claim under the common law if "the legislature intended to replace it with a statutory cause of action." *Wenners v. Great State Beverages*, 140 N.H. 100, 103, 663 A.2d 623, 625 (1995). The statute, however, applies only where the patient has communicated a serious threat of physical violence against a clearly

identified or reasonably identifiable victim. Therefore, the statute does not explicitly preempt all common law claims for a physician's failure to warn. It merely preempts the common law claims addressed by its language. *See* RSA 329:31. The statutory language does not evidence an "intent to replace" the common law claim in this case. *See Wenners*, 140 N.H. at 103, 663 A.2d at 625.

■ The defendants contend that our decision in *Boston Ice Co. v. Boston & Maine Railroad*, 77 N.H. 6, 86 A. 356 (1913), requires that we hold that RSA 329:31 implicitly repeals the common law. In *Boston Ice Co.*, we stated that "[w]hen a statute revises the whole subject of a former one and is clearly designed as a substitute, the former law is repealed although no express terms to that effect are used." *Id.* at 17, 86 A. at 359. However, we further explained:

> The rule does not rest strictly upon the ground of repeal by implication, but upon the principle that when the legislature . . . frames a new statute upon the subject-matter, and from the framework of the act it is apparent that the legislature designed a complete scheme for this matter, it is a legislative declaration that whatever is embraced in the new law shall prevail, and whatever is excluded is discarded.

*Id.* The subject matter embraced by RSA 329:31 is limited to a physician's duty to warn of a client's violent behavior when the client has communicated a serious threat of physical violence against a clearly identified or reasonably identifiable victim. The statute governs only those circumstances. The statute does not implicitly repeal the common law duty to warn of a potentially violent patient who may pose a danger to others.

## II. *Jury Instructions*

The defendants next challenge the trial court's jury instructions regarding the common law duty to warn claim. "We review jury instructions in context and will not reverse unless the charge, taken in its entirety, fails to adequately explain the law applicable to the case so that the jury could have been misled." *Chellman v. Saab-Scania AB*, 138 N.H. 73, 79, 637 A.2d 148, 151 (1993).

Relying on RESTATEMENT (SECOND) OF TORTS § 315 (1965), the trial court instructed:

> Generally there is no duty on the defendants to provide a warning regarding the conduct of a third person, such as

[the patient], to prevent him from causing physical harm to the plaintiff unless,

One: A special relationship exists between the defendants and the third person which imposes a duty upon the defendants to control the third person's conduct, or;

Two: A special relationship exists between the defendants and the plaintiff which gives the plaintiff a right to protection.

■■■ The defendants argue that compliance with the common law duty should be determined under a "reasonable professional" standard rather than a "reasonable person" standard. We reject this argument. In its charge, the trial court stated in pertinent part:

The test of reasonable care is what the ordinary prudent person would do under like or similar circumstances. It is up to you to decide whether or not the defendants exercised reasonable care under all the circumstances. A failure to fulfill this duty of reasonable care would be negligence and would amount to legal fault if it was a cause or a substantial cause of the injuries in this case.

In New Hampshire, "[t]he test of due care is what reasonable prudence would require under similar circumstances." *Weldy v. Town of Kingston*, 128 N.H. 325, 330-31, 514 A.2d 1257, 1260 (1986). The case before us is an ordinary duty of care case. It is only fortuitous that one of the defendants is a physician. Specialized training and experience do not excuse a physician from exercising the reasonable care of an ordinary person. In this case, the progress notes of the patient detail numerous prior events that served to put Dr. Curtis and CMC on notice that the patient may have been a threat. The defendants had fair warning that this patient may pose a threat to a phlebotomist who came in contact with him. Specialized training and experience were not required to make that determination.

Additionally, the jury asked whether the ordinary prudent person was a person on the street or a person with the experience of a doctor, nurse, or phlebotomist. The trial court responded that reasonable care is what the ordinary prudent person would do under similar circumstances. The trial court told the jury that it may consider the education, experience, and training of the doctors, nurses, and phlebotomists in this case. Thus, the jury was able to consider training and experience. We find no error in the manner in which the trial court addressed the issue of the "reasonable person" standard in its instruction.

■ The defendants next contend that the trial court did not properly instruct the jury as to the definition of foreseeability. The trial court instructed:

A person is not responsible for the consequences of their [*sic*] act unless the risk of an injury is reasonably foreseeable. The exact occurrence or the precise injuries need not be foreseen. In terms of foreseeability, we are talking about reasonable foreseeability of a risk of harm and not some sort of prophetic vision as to what might conceivably happen.

The defendants rely on N.H. CIVIL JURY INSTRUCTIONS 3D § 6.3 (1997), which states that to be foreseeable "the results of an act must not be merely possible, but probable." "The concept of foreseeability applied in this State originates from *Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339, 162 N.E. 99 (1928)." *Goodwin v. James*, 134 N.H. 579, 583, 595 A.2d 504, 507 (1991). "Generally, persons will not be found negligent if they could not reasonably foresee that their conduct would result in an injury to another or if their conduct was reasonable in light of the anticipated risks." *Manchenton v. Auto Leasing Corp.*, 135 N.H. 298, 304, 605 A.2d 208, 213 (1992). We have never held that foreseeability requires a finding of probability. *See, e.g., Manchenton*, 135 N.H. 298, 605 A.2d 208; *Goodwin*, 134 N.H. 579, 595 A.2d 504; *Corso v. Merrill*, 119 N.H. 647, 406 A.2d 300 (1979). Indeed, the defendants concede that they could not find a case from this jurisdiction that uses "the precise language of 'probable result' when discussing foreseeability."

The defendants next argue that the trial court should have instructed the jury that the plaintiff was required to prove that the patient communicated a serious threat of physical violence against a clearly identified or reasonably identified victim.

By this argument the defendants essentially attempt to impose the requirements of RSA 329:31 on the plaintiff's common law duty to warn claim. As stated above, however, RSA 329:31 is not applicable to this case. Accordingly, the trial court was correct in not incorporating the elements of RSA 329:31 in its instruction.

■ Finally, Dr. Curtis argues that the trial court should have instructed the jury that a mistake in judgment on the part of a physician is not evidence of negligence. Dr. Curtis relies upon *Leighton v. Sargent*, 27 N.H. 460, 472-73 (1853), in which we stated that "a professional man is not responsible for errors of judgment, for mere mistakes, in cases of reasonable doubt and uncertainty."

Dr. Curtis conceded during his opening statement, however, that this case does not involve medical malpractice. This is an ordinary duty to warn case. Therefore, we reject this argument.

Taking the jury instructions as a whole, we conclude that the trial court "fairly presented the case to the jury in such a manner that no injustice was done to the legal rights of the litigants." *Rawson v. Bradshaw*, 125 N.H. 94, 100, 480 A.2d 37, 41 (1984) (quotation omitted).

### III. Expert Testimony

The defendants next argue that expert testimony was necessary regarding the duty to warn. The plaintiff counters that the jury could determine for itself whether the patient posed a danger to those who came into contact with him.

"Expert testimony is required whenever the matter to be determined is so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman." *Lemay v. Burnett*, 139 N.H. 633, 635, 660 A.2d 1116, 1117 (1995) (quotation omitted). The defendants argue that expert testimony was necessary to determine the violent propensities of the patient.

We find that the evidence in this case presented ample examples of the patient's conduct for a layperson to determine whether a warning was necessary. For example, from the evidence that the patient pushed aside nurses and therapists, the jury could have concluded that it was foreseeable to an ordinary person that the patient might engage in this type of behavior again. Specialized medical training was not required for this determination. *Cf. Wood v. Public Serv. Co.*, 114 N.H. 182, 186-87, 317 A.2d 576, 578 (1974).

Moreover, Dr. Curtis conceded at trial that common sense, and not professional formal protocols, dictated when the frequency of a patient's violent behavior rose to the level of a genuine danger of harm. We conclude that determining whether the patient posed a risk and whether a warning was necessary were within the purview of the average juror.

### IV. Medical Reports.

Finally, the defendants challenge the admission of medical reports that postdated the June 19 assault as irrelevant, prejudicial, and inadmissible hearsay. One report, dated June 23, 1993, and authored by Dr. Lanes, provided, in part:

> This 75-year-old retired Caucasian male is seen for focal psychiatric consultation at the request of Lynn Curtis, M.D. after approximately two weeks on RMU.
>
> . . . .
>
> DISCUSSION: This would seem to be related to his stroke and most likely to his age. The atrial fibrillation may be a factor. I think that his initial trial of treatment with Droperidol did not provide sufficient control of symptoms and his aggressive behavior is potentially a threat to his own well being or to the well being of those around him. Therefore, Mellaril was tried.

Additionally, a nurse's report dated June 21 stated that during the 15:00 - 23:00 hours shift, the patient was "extremely suspicious of staff [and] combative." A second nurse's report stated, "After digging his fingernails into the nurse's aide's arm — I decided that the wound would be redressed later when more people were around to assist [and] control his behavior." The trial court ruled that these medical reports were relevant and not unfairly prejudicial. The trial court noted, however, that the medical reports were irrelevant to the physician's duty to warn because they postdated the assault.

Under New Hampshire Rule of Evidence 401, the trial court has discretion to determine whether evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.H. R. EV. 401; *see State v. Dewitt*, 143 N.H. 24, 26-27, 719 A.2d 570, 572 (1998). "We will not reverse a trial court's ruling on the admissibility of evidence absent an abuse of discretion. To show an abuse of discretion, the defendant[s] must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of [their] case." *Simpson v. Wal-Mart Stores*, 144 N.H. 571, 575, 744 A.2d 625, 629 (1999) (quotation and citation omitted). We note that "[t]here is no requirement . . . that evidence be relevant to all counts before the jury; the law only requires that it be relevant to one." *State v. Staymen*, 138 N.H. 397, 402, 640 A.2d 771, 774 (1994).

First, the defendants contend that the reports were irrelevant and unfairly prejudicial. They argue that because the reports were compiled after the assault, they have no relevance to what the defendants knew at the time of the assault and whether the defendants had a duty to warn on June 19. Similarly, the defendants contend that the reports were unfairly prejudicial because they

provided an inappropriate basis upon which the jury may have relied in determining whether any duty to warn existed before the June 19 assault.

■ We reject the defendants' arguments because the trial court instructed the jury not to consider the evidence on the question of whether the defendants had a duty to warn. The trial court admitted the reports for the limited purposes of determining whether the June 19 assault occurred and the effect the drug Droperidol had on controlling the patient, and so instructed the jury. When the trial court admitted Dr. Lanes' report, it instructed the jury to use it only on the question of whether Droperidol was effective in controlling the patient. Further, in its jury charge, the trial court instructed:

> Remember that any evidence which you heard for a limited purpose must be considered by you for that limited purpose only. You heard testimony about a report written by Dr. Lanes on June 23rd, 1993 about the effectiveness of the drug Droperidol and about [the patient's] alleged aggressive behavior. This document may only be considered by you for limited purposes. You may not consider the report itself on the question of whether the defendant had a duty to warn others about [the patient] before June 19th, 1993 because this report was not prepared until four days after the alleged incident in this case.

We presume that juries follow their instructions. *See State v. Smart*, 136 N.H. 639, 650, 622 A.2d 1197, 1210, *cert. denied*, 510 U.S. 917 (1993). When the trial court admitted the nurses' reports, it stated, "I'll [instruct the jury] again in my final instructions. I'll do it right now if people want me to and explain that this is coming in for a limited purpose. . . . It will not come in though on the issue of the duty of the doctors to warn because it's an event that occurred after the alleged incident." The defendants did not request a limiting instruction when the nurses' reports were admitted.

■ Additionally, the defendant CMC contends that the reports were inadmissible character evidence. *See* N.H. R. EV. 404(b). It argues that the reports, which were created subsequent to the assault and stated that the patient acted aggressively, are not admissible to show that the patient acted aggressively on June 19. The trial court admitted the reports over the defendant's objection because "[i]f it was a normal person in full control of their faculties . . . . it would be very difficult to get it in . . . [however,] we're not dealing with a person that's in control, complete control of their

faculties. We're dealing with someone who is aggressive and delusional." The record shows that the patient was laboring under the effects of his stroke and was often confused, disoriented, agitated, aggressive, and suffering from impaired cognition during his time at CMC. It further shows that the patient was not in "complete control of [his] faculties." Use of Dr. Lanes' report was limited to showing the effect the drug had on the patient's behavior, not for demonstrating the patient's character.

Finally, the defendants contend that Dr. Lanes' report was inadmissible hearsay. The trial court admitted the report under the business records exception to the hearsay rule. *See* N.H. R. EV. 803(6). The defendants argue that the court erred because neither the report's author, Dr. Lanes, nor a custodian of the record testified at trial. The plaintiff countered at trial that "[witnesses] testified that in the ordinary course of maintaining [someone like the patient] they bring in consulting physicians from different disciplines." She argued that Dr. Lanes was brought in by Dr. Curtis to aid in the team effort in treating the patient.

> The business records exception requires the proponent of the document to produce the custodian of the record, or another qualified witness, to testify about the identity and mode of preparation of the proffered document, and to testify that it was made in the regular course of business at or near the time of the transaction recorded.

*Wallace v. Lakes Region Const. Co., Inc.*, 124 N.H. 712, 715-16, 474 A.2d 1037, 1039 (1984). "The rationale behind extending the business records exception to include medical records was to bring accurate and reliable records into the courtroom in order to strike a sensible balance between the conflicting interests of the medical profession . . . and the discovery of truth in litigation." *Id.* at 715, 474 A.2d at 1039 (quotations omitted).

"Whether the record is sufficiently verified to justify its admission is a preliminary question of fact for the trial judge to pass upon." *Id.* at 716, 474 A.2d at 1039 (quotations omitted). Again, we will not reverse the trial court's ruling on the admissibility of evidence absent an abuse of discretion. *See Simpson*, 144 N.H. at 575, 744 A.2d at 629.

At trial, although Dr. Lanes did not testify, other witnesses testified about Dr. Lanes' consultation report. Dr. Curtis testified that his patients were cared for by a treatment team, which included consultant physicians whom he brought in to aid his treatment of patients. Dr. Curtis further testified that he would receive informa-

tion from other sources, such as staff and therapists, when treating patients.

■■■ At trial, the following exchange took place between the plaintiff's counsel and a nurse from CMC regarding the report:

[Counsel:] You were the case manager to [the patient] for the, in essence, the duration of his stay from the time you were appointed the case manager; is that correct?

[Witness:] Yes.

. . . .

[Counsel:] You're looking at a report that is the report of consultation authored by Dr. Lanes. Date of consult [June 23, 1993]; is that correct?

[Witness:] Yes.

[Counsel:] That report of consultation, [], was part of [the patient's] chart and you had seen it before today, have you not?

[Witness:] Yes.

[Counsel:] Now, through your experience as case manager for [the patient], you understood that Dr. Curtis himself had referred [the patient] for a consult with Dr. Lanes; is that correct?

[Witness:] Yes.

[Counsel:] And he referred that consult on June 22. Do you recall that?

[Witness:] Yes.

Further, defense counsel, in a colloquy with the trial judge, conceded that Dr. Curtis requested that Dr. Lanes be brought in as a consultant to advise him of the patient's status. Thus, Dr. Lanes' report was identified as a hospital record, prepared as part of a routine treatment plan, kept in the course of treating the patient, and relied upon by the treating physician. Under these circumstances, we need not address whether a medical opinion not relied upon by the treating physician is otherwise admissible. Thus, we

conclude that the trial court did not abuse its discretion by allowing the report into evidence.

*Affirmed.*

THAYER and NADEAU, JJ., did not sit; the others concurred.