Grafton
No. 2003-079

ESTATE OF JOSHUA T. & a.

v.

STATE OF NEW HAMPSHIRE & a.

Argued: October 8, 2003
Opinion Issued: December 29, 2003

*Nancy S. Tierney*, of Lebanon, by brief and orally, for the plaintiffs.

*Peter W. Heed*, attorney general (*Orville B. Fitch, II*, assistant attorney general, and *Karen A. Schlitzer*, attorney, on the brief, and *Mr. Fitch* orally), for the defendants.

BRODERICK, J. The plaintiffs, Estate of Joshua T., Dale and Patricia T. as administrators of the Estate of Joshua T. and as next friends, appeal an order of the Superior Court (*Burling*, J.) granting summary judgment to the defendants, the New Hampshire Division for Children, Youth and Families and its various employees (DCYF, collectively), on the plaintiffs' claim that they negligently caused the suicide of Joshua T. We affirm.

According to the undisputed facts, in 1983, when Joshua T. was two years old, he and his younger sister were removed from the home of their biological mother and placed into the custody of DCYF. Joshua and his sister were subsequently placed into the foster care of Dale and Patricia T., who permitted visitation between the children and their biological

mother with the permission of DCYF. During one such visit, Joshua was tied up and forced to watch his sister being sexually molested by their mother's boyfriend, who had been entrusted to watch them. By the early 1990s, Joshua was having significant emotional and behavioral problems. He ran away from home several times and was known to use drugs and alcohol. Dale and Patricia T. adopted Joshua and his sister in 1993, and DCYF continued to work with Joshua using social workers, counselors and psychologists to help determine what was in his best interests.

In 1994, Joshua stole a gun and believing it to be loaded, attempted suicide by pulling the trigger. A week later, Joshua stole his adoptive parents' van and crashed it while attempting to elude police officers in a high-speed chase. Later that year, Joshua again attempted suicide by ingesting his adoptive father's heart medication. He suffered multiple strokes that left him with permanent physical impairments to the left side of his body. Due to the alarming nature of his actions, the adoptive parents, without relinquishing parental rights, agreed to place Joshua in DCYF"s care so that he could receive necessary health services. During the next few years, Joshua resided in different placements. Finally, in March 1997, he was placed in the foster home of Philip and Susan S. Even though the S. foster parents had indicated their unwillingness to accept a foster child who had a history of attempted suicide or sexual abuse, DCYF placed Joshua in their care without disclosing his history.

In late January 1998, the Haverhill Police Department received a report of a burglary from Joshua's brother-in-law by adoption. Joshua had previously lived in his home, and the brother-in-law informed the police that he suspected Joshua had stolen the missing items, which included two handguns and ammunition. The police arranged to meet later that evening at the S. home with Mr. S. and a local police officer.

Mr. S. arrived home at 5:30 p.m. and spoke with Joshua in his bedroom. He noticed empty beer cans as well as a half-full beer can in Joshua's room and believed Joshua had been drinking. While Joshua went to the bathroom, Mr. S. looked around the room for guns and found none. Knowing that the police would arrive shortly, Mr. S. chose not to confront Joshua about the alleged burglary. Mr. S. went upstairs to discard the beer he had confiscated and heard a gunshot. He ran to Joshua's room, forced open the door and found that Joshua had shot himself in the head. At the time of his tragic death, Joshua was sixteen years old.

Joshua's adoptive parents, as administrators of his estate, filed suit against DCYF and several of its employees, alleging their legal responsibility for Joshua's death. In their writ, they claimed, *inter alia*, that the defendants were negligent by failing to place Joshua in an

appropriate foster home. The defendants moved for summary judgment, arguing the plaintiffs did not intend to offer expert testimony to support their negligence claim, and that the undisputed facts did not fall within the two recognized exceptions to the general rule articulated in *McLaughlin v. Sullivan*, 123 N.H. 335, 337 (1983), that precludes negligence actions for the suicide of another. The trial court granted the motion, and this appeal followed.

When reviewing a trial court's grant of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. *Sintros v. Hamon*, 148 N.H. 478, 480 (2002). We affirm a trial court's decision if our review of the evidence discloses no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* Because no one contends on appeal that any material facts remain in dispute, we need only determine whether the defendants were entitled to judgment as a matter of law. *Del Norte, Inc. v. Provencher*, 142 N.H. 535, 537 (1997). We review the trial court's application of the law to the facts *de novo*. *Id.*

The plaintiffs argue that expert testimony was not required to establish DCYF's negligence because, based upon the undisputed facts of the case, the jury could simply apply its "good judgment and common sense" to assess whether DCYF appropriately or negligently placed Joshua in the S. foster home. They specifically rely upon the fact that DCYF placed Joshua in the home knowing that the foster parents were not willing to provide care for a child with a history of attempted suicide and sexual abuse and failed to disclose Joshua's history. Assuming, without deciding, that lay testimony alone could establish that DCYF breached its duty of care when it placed Joshua in his last foster home, proving the causal connection between DCYF's negligent placement and Joshua's suicide requires expert testimony.

██ ██ It is axiomatic that in order to prove actionable negligence, a plaintiff must establish that the defendant owed a duty to the plaintiff, breached that duty, and that the breach proximately caused the claimed injury. *See Sintros*, 148 N.H. at 480; *Weldy v. Town of Kingston*, 128 N.H. 325, 330 (1986). The proximate cause element involves both cause-in-fact and legal cause. *Bronson v. The Hitchcock Clinic*, 140 N.H. 798, 801 (1996); *see Brookline School Dist. v. Bird, Inc.*, 142 N.H. 352, 354-55 (1997). Cause-in-fact requires the plaintiff to establish that "the injury would not have occurred without [the negligent] conduct." *Bronson*, 140 N.H. at 801. The plaintiff "must produce evidence sufficient to warrant a reasonable juror's conclusion that the causal link between the negligence

and the injury probably existed." *Id.* Further, legal cause requires a plaintiff to establish that the negligent conduct was a substantial factor in bringing about the harm. *Brookline School Dist.*, 142 N.H. at 354; *see Petition of Haines*, 148 N.H. 380, 382 (2002) (legal cause refers to substantial factor test). Although the negligent conduct need not be the sole cause of the injury, to establish proximate cause a plaintiff must prove that the defendant's conduct caused or contributed to cause the harm. *Brookline School Dist.*, 142 N.H. at 355.

The question of proximate cause is generally for the trier of fact to resolve. *See id.* Expert testimony is required, however, to aid the jury "whenever the matter to be determined is so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman." *Powell v. Catholic Med. Ctr.*, 145 N.H. 7, 14 (2000). In medical malpractice cases, for example, expert testimony is generally required to establish the proximate cause element. *See Thorpe v. State*, 133 N.H. 299, 304 (1990); *Bronson*, 140 N.H. at 801 (statutory requirement of expert testimony in medical malpractice cases reflects plaintiff's burden at common law). In particular, expert testimony is necessary to establish causation "if *any inference* of the requisite causal link must depend [upon] observation and analysis outside the common experience of jurors." *Thorpe*, 133 N.H. at 304 (quotation omitted; emphasis added). This "serves to preclude the jury from engaging in idle speculation." *Lemay v. Burnett*, 139 N.H. 633, 634 (1995). Lay testimony suffices, however, "only if the cause and effect are so immediate, direct and natural to common experience as to obviate any need for an expert medical opinion." *Reed v. County of Hillsborough*, 148 N.H. 590, 591 (2002). We apply this framework to the undisputed facts of this case.

To find a causal connection between DCYF's placement of Joshua in the S. home and his ultimate death, the jury would be required to conclude that his residence there was a substantial factor in bringing about his suicide and that his suicide would not have occurred without that alleged negligent placement. Thus, the jury would be required to examine the particular environment of the foster home to assess whether it contributed to Joshua's suicide. If Joshua would have committed suicide even had DCYF placed him in a foster home that was willing to provide care for him knowing of his history, then DCYF's placement of him in the S. home would not be the proximate cause of his death.

Suicide is not easily explained or understood. Its causes, prevention, triggers and warning signs cannot be readily calculated. We conclude that the average person lacks the experience, training or education about the

complexities of suicide to be able to assess whether a particular home environment and parenting style, as in this case, contributed to a troubled youth's self-inflicted death or whether the youth would have committed suicide even absent the challenged circumstances. *Compare Lemay,* 139 N.H. at 636 (average juror's experience with diving board does not equip juror with ability to assess particular variables that lead to reasonably safe diving conditions) *with Powell,* 145 N.H. at 14 (average juror equipped with common sense necessary to determine whether frequency of patient's violent behavior rose to level of genuine danger of harm to others). Assessing the causal link between DCYF's alleged negligent placement and Joshua's death, without the assistance of expert testimony, is simply beyond the capacity of an average juror and would amount to speculation, especially considering Joshua's self-destructive behavior and suicide attempts while in the care of his adoptive parents.

Therefore, we conclude that expert opinion testimony was necessary to assist the jury to determine whether a causal link existed between Joshua's placement in the S. home and his ultimate death. Accordingly, the trial court correctly granted the defendants' motion for summary judgment. We decline to rule upon any theory of negligence, to the extent asserted, other than negligent placement as the plaintiffs failed to provide developed legal argument warranting appellate review. *See State v. Laurent,* 144 N.H. 517, 521 (1999). Having concluded that expert testimony was required in this case, we need not decide whether the undisputed facts of this case fall within the recognized exceptions identified in *McLaughlin,* 123 N.H. at 337, or whether an additional exception is justified.

*Affirmed.*

BROCK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.