UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Thomas D. Markovich, as Administrator
of the Estate of Ann L. Markovich

      v.                                 Civil No. 1:20-cv-00305-JL
                                        Opinion No. 2022 DNH 090

Lincare, Inc.


## MEMORANDUM ORDER

In this state law negligence action, resolution of the defendant's summary judgment motion hinges on the sufficiency of the plaintiff's evidence of causation. The plaintiff – as the administrator of his wife Ann Markovich's estate – has filed suit against defendant Lincare, Inc., a supplier of durable medical equipment (DME), alleging that Lincare negligently failed to timely deliver a suction machine and oxygen supplies to the plaintiff's home upon his wife's return from the hospital. He further alleges that Lincare's failure to deliver the supplies proximately caused Mrs. Markovich's death. The plaintiff's retained expert witness opined that "to a reasonable degree of medical certainty," had Lincare timely delivered the supplies, Mrs. Markovich would not have suffered an untimely death. She later testified at her deposition that there was a "chance" an available suction machine would have removed or dislodged the mucous plug that led to Mrs. Markovich's death, but that she could not put a specific percentage on that chance.

Lincare moves for summary judgment, arguing that the plaintiff's negligence claims fail as a matter of law because neither his expert's opinions nor the lay witness

testimony adequately establish causation. The plaintiff contends that his expert is not required to provide a specific percentage chance of survival and that her other opinions sufficiently show causation. This court has jurisdiction over the plaintiff's claims under 28 U.S.C. § 1332 (diversity) because the parties are citizens of different states and the amount in controversy exceeds $75,000. The parties agree, and the court confirmed at the summary judgment hearing, that New Hampshire law applies to the plaintiff's claims.

After considering the parties' written submissions and holding an evidentiary hearing where the expert testified, the court denies Lincare's motion. While the court is tempted to view this dispute as an argument over semantics, the parties' positions reveal a good faith, legitimate disagreement as to the required evidence to establish causation and whether the plaintiff's evidence satisfies that standard. A rational fact finder could conclude from Dr. Means' opinions that the causal link between Lincare's alleged negligence and Mrs. Markovich's death probably existed. Dr. Means' inability to assign a specific percentage chance of survival to Mrs. Markovich does not render her opinion insufficient and the plaintiff has thus created a trial worthy-issue on the causation element of his negligence claims.

## I.     Applicable legal standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial by a rational fact finder, and "material" if it could sway the

2

outcome under applicable law.  Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).

In analyzing a summary judgment motion, the court "views all facts and draws all

reasonable inferences in the light most favorable to the non-moving party."  Id.

Where "the moving party avers an absence of evidence to support the non-moving party's

case, the non-moving party must offer definite, competent evidence to rebut the motion."

Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009).  In other words, the

non-moving party "must proffer admissible evidence that could be accepted by a rational

trier of fact as sufficient to establish the necessary proposition."  Gomez-Gonzalez v.

Rural Opportunities, Inc., 626 F.3d 654, 662 n.3 (1st Cir. 2010).  "[C]onclusory

allegations, improbable inferences, or unsupported speculation" will not suffice to defeat

a properly supported summary judgment motion.  Meuser, 564 F.3d at 515 (quotation

omitted).

## II.     Background

### A.     Briefing

Under Local Rule 56.1, the parties submitted statements of material facts with

their summary judgment briefing.  Rather than incorporate those statements of fact into

their summary judgment memoranda (as contemplated by the Local Rules), the parties

filed them as standalone documents.[1]  Indeed, the plaintiff filed a separate "response" to

Lincare's statement of material facts, rather than his own statement of material facts, in

which he either admitted, denied, or qualified his response to each separate statement of

---

[1] See doc. nos. 45-1 and 46-8.

3

fact alleged by Lincare. Neither the Federal Rules of Civil Procedure nor this court's Local Rules, however, contemplate such a procedure for summary judgment litigation. The parties' approach afforded them the opportunity to well exceed the 25-page limit for memoranda in support of, or in opposition to, dispositive motions, as required by Local Rule 7.1(a)(3). While the court ascribes no ill intent on the part of counsel for structuring their filings in this manner and will not strike any filings, it reminds litigants to review, understand, and follow the Local Rules when filing documents in this court.

## B. Material facts

The following facts are undisputed, unless otherwise noted. See L.R. 56.1(b) ("All properly supported material facts set forth in the moving party's factual statement may be deemed admitted unless properly opposed by the adverse party."). Plaintiff Thomas Markovich was married to Ann Markovich and, following her death, became the administrator of her estate. Lincare is a supplier of DME, including oxygen and respiratory therapy products, suction machines, and other services to patients in their homes. Lincare has a service center in Bedford, New Hampshire and while its drivers deliver DME to customers, they are not qualified or trained to provide medical care.

Mrs. Markovich had tracheomalacia, a condition causing the partial collapse of her trachea. On May 3, 2017, Mrs. Markovich underwent a tracheal stent placement procedure at Brigham and Women's Hospital in Boston. During the procedure, Mrs. Markovich experienced a mucous plug that lead to a "Type 2 (2/2) respiratory failure." Less than two weeks later, Mrs. Markovich's tracheal stent was removed and she underwent a tracheostomy. In early June 2017, Mrs. Markovich was transferred from

4

Brigham to Spaulding Rehabilitation Hospital in Cambridge, Massachusetts. Mrs. Markovich received a second opinion regarding the severity of her condition at Beth Israel Deaconess Medical Center in Boston in early August 2017. During transport back to Spaulding, Mrs. Markovich experienced another mucous plug incident and respiratory distress, requiring admission to the emergency department at Beth Israel and a brief stay in the intensive care unit. She returned to Spaulding on August 7, 2017.

During her stay at Spaulding, Mrs. Markovich experienced other mucous plugs in her tracheostomy tube that led to respiratory distress or medical emergencies. Medical staff at Spaulding used a suction machine to remove the mucous plugs. Mrs. Markovich also intermittently utilized oxygen therapy through her tracheostomy mask.

Spaulding discharged Mrs. Markovich on Monday, March 5, 2018. At the time of discharge, Spaulding provided Mrs. Markovich with one oxygen tank, but not a suction machine. Mr. Markovich and Mrs. Markovich's daughter Karen Sarazin understood that a Spaulding case manager named Deborah Robertson, R.N., was coordinating delivery of additional oxygen tanks and a suction machine to the Markovich's residence upon her discharge. Nurse Robertson completed Mrs. Markovich's discharge notes. In the notes, Nurse Robertson listed "Lincare: 603-471-9162" as the provider of "Oxygen, nebulizer and suction machine" for Mrs. Markovich. She further noted that the Spaulding discharge paperwork was "faxed to follow up service providers, including PCP" and that "[a]ll [were] in agreement with plan as described above." The plaintiff's understanding was that the equipment would be at his house before he and his wife arrived home from

5

Spaulding. When the plaintiff arrived home with Mrs. Markovich on March 5, the oxygen tanks and suction machine had not been delivered.

Nurse Nicole Owen, R.N. from Interim Healthcare was assigned to admit Mrs. Markovich to home care service upon her discharge from Spaulding. Nurse Owen's understanding was that Mrs. Markovich's oxygen therapy and suction machine would be at her residence when she arrived home from Spaulding. The Markoviches arrived home sometime after 3:00 pm on March 5, and Nurse Owen arrived about 40 minutes later. Sarazin arrived shortly before 4:00 pm. Upon arriving, Nurse Owen noted that the suction machine, oxygen, and nebulizer had not yet arrived at the Markovich residence. Nurse Owen then contacted her office manager to inquire about the delivery status of this equipment. A woman named "Kathy," the office manager from Interim Health, spoke with Lincare's Bedford service center Manager Sarah Smith-Troupakis about the delivery. Smith-Troupakis told Kathy that Lincare would send the suction machine and catheters to use with the suction machine. Kathy relayed this information to Nurse Owen and Nurse Owen understood from this conversation that a suction machine would be delivered to the house.

At some point after 4:00 pm, Mrs. Markovich told Nurse Owen that she would need to be suctioned after the suction machine arrived, but Ms. Markovich did not appear to be in distress. At around 5:35 pm, Mrs. Markovich used the bathroom. While in the bathroom, she screamed that she could not breathe and Nurse Owen and Sarazin retrieved Mrs. Markovich and assisted her to the couch. Nurse Owen checked Mrs. Markovich's blood oxygen level, which had dropped to a percentage "in the 70s" and called an

6

ambulance. Nurse Owen observed that a mucous plug had formed in Mrs. Markovich's tracheostomy tube and believes the plug had formed in less than one minute. Mrs. Markovich then stopped breathing and became unresponsive. Nurse Owen attempted to use the oxygen tank that Spaulding had provided, but it was empty. She then began CPR on Mrs. Markovich.

Mrs. Markovich was in cardiac arrest when EMS arrived at the Markovich residence at 5:41 p.m. EMS personnel continued CPR, achieved a pulse using a defibrillator, and transported Mrs. Markovich to Parkland Medical Center in Derry, NH. She was later transferred to Massachusetts General Hospital in Boston and remained in a coma there from March 5, 2018 until her death on March 18, 2018. Shortly after EMS arrived at the Markovich residence, Lincare's delivery driver arrived with the suction machine and other DME.

## C.     Procedural background relative to expert opinions

Because this motion for summary judgment implicates expert witness testimony and opinion evidence, the court briefly summarizes the relevant procedural background. The plaintiff initially did not disclose an expert witness on the issue of causation, believing it was unnecessary. After Lincare moved for summary judgment in part due to a lack of expert witness testimony on causation, the plaintiff sought leave of court to belatedly disclose an expert.[2] The court granted the plaintiff's request, with the caveat that plaintiff's counsel would be responsible for paying Lincare's attorneys' fees and

---

[2] See doc. no. 32.

costs associated with deposing the plaintiff's newly retained expert and disclosing its own

expert, as well as the fees incurred in drafting the portion of the prior summary judgment

motion relating to causation.  The plaintiff then disclosed Melissa Lynn Means, MD,

FACP, FCCM, a pulmonary critical care physician at Suburban Hospital in Bethesda,

Maryland.  After Lincare deposed Dr. Means, it filed the present motion for summary

judgment.  In response to Lincare's motion, the plaintiff submitted a sworn statement

from Dr. Means.[3]  At the court's request, Dr. Means testified at the summary judgment

hearing.

### III.   Analysis

Lincare argues that it is entitled to summary judgment on the plaintiff's negligence

claims[4] because the plaintiff cannot establish – through legally sufficient evidence – that

Lincare's alleged negligence caused Mrs. Markovich's injuries and death.  The plaintiff

responds that Dr. Means' opinion provides the requisite evidence of causation and her

deposition testimony does not render that opinion insufficiently speculative.  The court

agrees with the plaintiff.

### A.   Causation

The plaintiff's claims sound in negligence.  To recover for negligence under New

Hampshire law, "a plaintiff must show that the defendant owes a duty to the plaintiff and

---

[3] See Sworn Statement of Dr. Melissa Means (doc. no. 46-3).

[4] The plaintiff asserts three essentially identical negligence claims against Lincare, but they are styled as separate counts because each seeks different remedies.

8

that the defendant's breach of that duty caused the plaintiff's injuries." Christen v. Fiesta Shows, Inc., 170 N.H. 372, 375 (2017). Specifically, the plaintiff asserts that Lincare owed Mrs. Markovich a duty of care to timely deliver her suction machine, oxygen supplies, and other DME and breached this duty by failing to deliver the DME prior to her arrival home from Spaulding. For purposes of this motion, Lincare does not contest that it owed Mrs. Markovich a duty of care. Rather, Lincare argues that based on the undisputed material facts and record evidence, no rational fact finder could conclude that its alleged breach of duty caused Mrs. Markovich's injuries.

"The concept of proximate cause includes both the cause-in-fact and the legal cause for the injury." Beckles v. Madden, 160 N.H. 118, 124–25 (2010) (citing Bronson v. The Hitchcock Clinic, 140 N.H. 798, 801 (1996)). Conduct is cause-in-fact if the injury would not have occurred without that conduct. Id. The evidence to support this causal link must be "sufficient to warrant a reasonable juror's conclusion that the causal link between the negligence and the injury probably existed." Bronson, 140 N.H. at 801; see also Goudreault v. Kleeman, 158 N.H. 236, 246 (2009). This standard is satisfied if the evidence shows "with reasonable probability, not mathematical certainty, that but for the defendant's negligence, the harm would not have occurred." Bronson, 140 N.H. at 802–03. "[L]egal cause requires a plaintiff to establish that the negligent conduct was a substantial factor in bringing about the harm." Estate of Joshua T. v. State, 150 N.H. 405, 408 (2003). "Although the negligent conduct need not be the sole cause of the injury, to establish proximate cause a plaintiff must prove that the defendant's conduct caused or contributed to cause the harm." Id.

9

Expert testimony is necessary to establish causation "if any inference of the requisite causal link must depend [upon] observation and analysis outside the common experience of jurors." Id. This "serves to preclude the jury from engaging in idle speculation." Lemay v. Burnett, 139 N.H. 633, 634 (1995). Expert testimony is "frequently required to prove medical causation in cases involving allegations of physical injuries." Id. at 635. If the "matter to be determined is so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman," expert testimony is required. Id. (quoting District of Columbia v. Freeman, 477 A.2d 713, 719 (D.C. 1984)). Lay testimony suffices, however, "only if the cause and effect are so immediate, direct and natural to common experience as to obviate any need for an expert medical opinion." Est. of Joshua T., 150 N.H. at 408 (quoting Reed v. County of Hillsborough, 148 N.H. 590, 591 (2002)).

### 1. Necessity of expert testimony

In prior summary judgment briefing, the plaintiff argued that expert witness testimony was unnecessary to show causation in this case. He has since retreated from that position and the parties now agree that expert testimony on causation is required. The court agrees as well. The cause of Mrs. Markovich's demise and the effect of Lincare's alleged negligence are not so immediate, direct, and natural to the common sense of an average juror as to require only lay witness testimony. And the lay witness testimony here is too speculative to support a finding of causation.

It is unlikely that an average juror has used a suction machine or encountered a situation where a person with a tracheostomy tube was experiencing a respiratory

10

emergency due to a mucous plug and needed a suction machine to alleviate that emergency. A suction machine is not a commonly used device outside of a hospital or other acute medical care provider setting. Indeed, in this case, a respiratory therapist and medical staff from Spaulding developed a routine for suctioning Mrs. Markovich's mucous plugs. Nor could an average juror determine whether the particular combination of medical conditions Mrs. Markovich experienced at her home upon returning from Spaulding (mucous plug, aspiration, potentially low oxygen) could have been alleviated simply by using an available suction machine, as opposed to some other specialized medical equipment. See Lemay, 139 N.H. at 636 ("[W]e do not believe that the average juror could determine whether the particular combination of diving conditions found in Burnett's pool—that is, water depth, diving board stiffness, diving board height, etc.—led to reasonably safe diving conditions for a man of Lemay's height and weight performing a certain style of dive.").

In sum, whether Lincare's alleged negligence proximately caused her injuries and untimely death presents a series of distinct medical or scientific questions that are "beyond the experience of average jurors" and therefore require expert testimony under New Hampshire law. Bartlett v. Mutual Pharmaceutical Co., 731 F. Supp. 2d 184, 188 (D.N.H. 2010) (granting summary judgment to the plaintiff on defendant's contributory negligence defense because "[w]ithout expert testimony, the jury has no reliable way of determining whether, or to what extent, [the plaintiff's] conduct caused or contributed to [the] injuries" in question).

## 2. The required causation evidence

The parties' present dispute centers on the "quantum of expert testimony necessary" to establish causation and whether the plaintiff's evidence satisfies that standard. Beckles, 160 N.H. at 125 (quoting Goudreault, 158 N.H. at 246). A "medical expert's competent opinion that the defendant's negligence probably caused the harm establishes the quantum of expert testimony necessary." Goudreault, 158 N.H. at 246; see also Zibolis-Sekella v. Ruehrwein, No. 12-CV-228-JD, 2013 WL 4042423, at *2–3 (D.N.H. Aug. 8, 2013) (DiClerico, J.) (finding that an expert's "opinions about causation [that] are based on mere possibilities and speculation . . . do not meet the requirements of Rule 702"). Thus, for purposes of deciding this motion, the court's task is to determine "whether the summary judgment record, including the expert testimony . . . would be sufficient to warrant a reasonable juror's conclusion that the causal link between [Lincare's] alleged negligence and [Mrs. Markovich's death] probably existed." Beckles, 160 N.H. at 125.

## 3. Dr. Means' proffered testimony

The record evidence supporting the plaintiff's causation theory consists of: (1) Dr. Means' report; (2) Dr. Means' deposition testimony; and (3) Dr. Means' sworn statement.[5]

_____

[5] As mentioned previously, to the extent that a fact witness could have opined about the plaintiff's causation theory, no witnesses have provided such testimony here. Sarazin could not opine with reasonable probability that a suction machine would have removed Mrs. Markovich's mucous plug. And when asked whether the mucous plug could have been removed had a suction

12

In her report, Dr. Means states that:

> It is therefore my opinion to a reasonable degree of medical certainty that had the Lincare Company timely delivered Ms. Markovich's oxygen and suction supplies, Ms. Markovich would not have suffered such an unnecessary and untimely death. She would not have run out of oxygen, she would have had suctioning available if a mucus plug developed, and ultimately she would not have become hypoxic and suffered a cardiopulmonary arrest leading to her death. In all likelihood, suctioning would have removed the mucous plug that effectively led to her death.

Doc. no. 46-2, at 3. Dr. Means' unsworn report cannot be considered part of the summary judgment record, however, because it is hearsay. See Foley v. Town of Lee, 871 F. Supp. 2d 39, 46 (D.N.H. 2012) ("Finally, the expert report also meets the literal definition of hearsay, e.g., an out-of-court statement offered for its truth."); Ramirez-Ortiz v. Corporacion Del Centro Cardiovascular de Puerto Rico y Del Caribe, 32 F. Supp. 3d 83, 88 (D.P.R. 2014) ("To be considered at the summary judgment stage, therefore, Dr. Adams' expert opinion must be elicited through the testimony of the expert witness himself, not through his [unsworn] report."). The court thus looks to other record evidence.

Defense counsel deposed Dr. Means during discovery. At deposition, Dr. Means did not repeat the causation opinion from her report because she was not directly asked about it. Instead, defense counsel elicited the following testimony regarding causation:

> Q. So as we sit here today is there any way to know how long it would take the Markovich family or the nurse to attempt to remove the mucous plug using a suction, had a suction been there? Is there any way to know how long that would have taken -- given we don't know the size of the plug?

---

machine been available, Nurse Owen testified: "Potentially, yes. There is a potential that it could have but I don't know." Owen Depo. (doc. no. 46-7) at 60.

A. To tell you a specific answer of time, no, there's no way to know.

Q. Is there any way to know with -- is there any way to know whether they would have been successful at removing the mucous plug had a suction device been there?

A. Well, you don't know if they'd have been completely able to remove it, but at least there would have been a chance she could have been helped. So the answer of course is no.

Q. And there's a -- I understand that, I understand there's a chance. But is there any way to know at this point in time what that percentage chance would have been that it could have been removed or could have been moved?

A. Yeah, no, I can't, that would be dishonest, I don't know.

Doc. no. 45-7, at 72.

After Lincare moved for summary judgment, the plaintiff submitted a sworn statement from Dr. Means with his opposition to the motion.[6] The statement provides, in relevant part, that:

> [I]t is my opinion to a reasonable degree of medical certainty that had the Lincare Company timely delivered Ms. Markovich's oxygen and suction supplies, Ms. Markovich **likely** would not have suffered such an unnecessary and untimely death. She would not have run out of oxygen, she would have had suctioning available if a mucus plug developed, and ultimately she **likely** would not have become hypoxic and suffered a cardiopulmonary arrest leading to her death. **In all likelihood**, suctioning would have removed the mucous plug that effectively led to her death.

Doc. no. 46-3, at 3 (emphasis added). This portion of Dr. Means' statement mirrors her report with two notable exceptions. In her statement, Dr. Means adds that Mrs.

---

[6] See doc. no. 46-3.

Markovich "likely" would not have died and "likely" would not have become hypoxic and suffered cardiopulmonary arrest had Lincare delivered her oxygen and suction supplies on time.

Seizing on Dr. Means' refusal to place a "percentage chance" on the likelihood that an available suction machine or oxygen therapy would have prevented Mrs. Markovich's demise, Lincare argues that Dr. Means' opinion is too uncertain, and thus insufficient, to establish causation. Lincare further argues that Dr. Means' sworn statement should be stricken as an inadmissible "sham" affidavit. The plaintiff rejoins that Dr. Means' refusal to assign a percentage chance does not render her causation opinion unreliable or speculative. He also argues that Dr. Means' statement is consistent with her report and deposition testimony, and that the statement provides sufficient evidence from which a jury could conclude that it was reasonably probable that Lincare's negligence caused Mrs. Markovich's death. Specifically, the plaintiff asserts that Dr. Means' opinion in her report and sworn statement that "[i]n all likelihood, suctioning would have removed the mucous plug that effectively led to [Mrs. Markovich's] death" is sufficiently certain evidence of causation. The plaintiff further contends that Dr. Means' opinion based on a "reasonable degree of medical certainty" equates to reasonable probability.

The court agrees with the plaintiff that Dr. Means' failure to assign a percentage chance does not doom her causation opinion. Expert witnesses are not required to

15

designate a specific percentage chance of survival or "quantify probability in degrees"[7] in order for their opinions to support a finding of causation. See Goudreault, 158 N.H. at 246 ("The plaintiff need only show with reasonable probability, not mathematical certainty, that but for the defendant's negligence, the harm would not have occurred.") (quoting Bronson, 140 N.H. at 802-03). Dr. Means' declination to provide a specific percentage chance of survival does not exclude the possibility that the percentage could still be more likely than not, or greater than 50%. And Lincare's counsel did not eliminate that possibility at Dr. Means' deposition.

At the same time, while "[m]edical experts need not use specific words or phrases that mirror the statutory standard in order to furnish sufficient evidence to support causation," Beckles, 160 N.H. at 125, the court agrees with Lincare that Dr. Means' use of the phrase "'reasonable degree of medical certainty' [alone] does not make [her] causation opinion admissible." Tamraz v. Lincoln Elec. Co., 620 F.3d 665, 671 (6th Cir. 2010); but see St. Pierre v. Elgert, 145 N.H. 620, 624 (2000) (expert's testimony that there was a "reasonable medical probability" that the plaintiff's infection in her uterus was "instigated and started by" the defendant's medical failure was sufficient evidence of causation). The court thus turns to the remainder of Dr. Means' opinions.

Dr. Means opines repeatedly that it is "likely" Mrs. Markovich would have survived had Lincare delivered the suction machine on time. See Dr. Means' Sworn

---

[7] Lincare Reply (doc. no. 48) at 2.

Statement (doc. no. 46-3) ("in all likelihood, suctioning would have removed the plug").[8]

Although Dr. Means does not state "how" likely, this opinion, construed in the light most favorable to the plaintiff, "would be sufficient to warrant a reasonable juror's conclusion that the causal link between [Lincare's] alleged negligence and [Mrs. Markovich's death] probably existed." Beckles, 160 N.H. at 125; see also Hodgdon v. Frisbie Mem. Hosp., 147 N.H. 286, 291 (2001) (expert's opinion that patient "probably" would have retained her vision absent the defendant's alleged negligence was sufficient to establish proximate cause); Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1152 (1st Cir. 1996) ("The jury heard opinion evidence from a renowned cardiologist that serious brain damage (and, hence, death) would have been forestalled had the paramedics reached the premises ten minutes earlier. On this record, we believe that a reasonable jury could conclude that the defendant's omission negated a substantial possibility that the rescue efforts would have succeeded.").

---

[8] The court declines to reject Dr. Means' statement as a "sham affidavit." The so-called "sham affidavit" rule prevents parties from "creat[ing] a conflict and resist[ing] summary judgment with an affidavit that is clearly contradictory" to prior deposition testimony. Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994). The rule applies, however, only "[w]hen an interested witness has given clear answers to unambiguous questions" during the original deposition. Id. Lincare's questions to Dr. Means about the certainty or percentage chance of her causation opinions were ambiguous, and at best, incomplete. Lincare's counsel did not ask Dr. Means to explain, or elaborate on, the causation opinion in her report or ask her whether she felt it was more probable than not that Mrs. Markovich would have survived. Moreover, Dr. Means' answers were not clear and her post-deposition statement does not conflict with her deposition testimony. "A subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment." Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 26 (1st Cir. 2002). The court thus considers Dr. Means' statement as part of the summary judgment record.

Citing <u>Daubert</u> principles and Federal Rule of Evidence 702, Lincare argues in passing that because Dr. Means allegedly based her opinions on insufficient (or inaccurate) facts or data, those opinions are unreliable and inadmissible.[9] <u>See</u> <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 590 (1993). Lincare has not, however, separately moved (as required by the court's Local Rules) to exclude or strike Dr. Means' opinions from the summary judgment record or trial, and the deadline for expert challenges has long passed. <u>See</u> L.R. 7.1(a)(1) (prohibiting litigants from combining separate requests for relief in one motion). The court therefore does not consider Lincare's summary judgment motion a request to exclude her testimony or opinions.

Even if the court construed Lincare's summary judgment motion in this manner, Lincare fails to develop arguments in favor of an exclusion remedy and the "record as it stands is wholly inadequate to permit a reasoned <u>Daubert</u> determination." <u>Cortes-Irizarry v. Corporacion Insular De Seguros</u>, 111 F.3d 184, 189 (1st Cir. 1997). Lincare devotes less than two pages of its motion to discussing <u>Daubert</u> or Rule 702 principles and does not meaningfully explain (besides repeating the <u>Daubert</u> factors) why Dr. Means' opinions are unreliable.

While the "<u>Daubert</u> regime can play a role during the summary judgment phase of civil litigation," the trial setting "normally will provide the best operating environment for the triage which <u>Daubert</u> demands." <u>Cortez-Irizarry</u>, 111 F.3d at 188. Courts must use caution at the summary judgment stage "not to exclude debatable scientific evidence

---

[9] <u>See</u> doc. no. 45, at 13.

without affording the proponent of the evidence adequate opportunity to defend its admissibility," except when "defects are obvious on the face of" an expert's proffer. Id. Such defects are not obvious from the face of Dr. Means' statement or deposition testimony.

Notwithstanding its failure to properly assert or develop an expert exclusion request, Lincare's challenge to the reliability of Dr. Means' opinions is without merit. Lincare does not question Dr. Means' qualifications to render a causation opinion in this case. Dr. Means has removed mucous plugs of varying size and severity using a suction machine, and understands how long it typically takes to either remove or dislodge a plug in a manner that allows a person's airway to clear. She further testified with specificity on the length of time a person could last without sufficient oxygen before suffering permanent brain damage and death. And medical opinions, unlike other scientific methods or calculations, often require the expert to exercise judgment and offer inexact opinions on probabilities or likelihoods of medical outcomes.

Likewise, to the extent that Dr. Means assumed certain facts or relied on questionable "factual underpinnings" in order to render her opinions, and Lincare objects to her testimony on that basis, such objections "go to the weight of the proffered testimony, not to its admissibility." Crowe v. Marchand, 506 F.3d 13, 18 (1st Cir. 2007); see also Goudreault, 158 N.H. at 246 ("To the extent there were gaps in Dr. Golding's [causation] explanations, these omissions concern the relative weight and credibility of competing expert testimony rather than the basic reliability of such testimony, and are the province of the fact finder, not the trial court. [O]bjections to the basis of an expert's

19

opinion go to the weight to be accorded the opinion evidence, and not to its admissibility. The appropriate method of testing the basis of an expert's opinion is by cross-examination of the expert.") (quotations and citations omitted).  Any such gaps or "factual uncertainties underlying [Dr. Means'] testimony" therefore do not render her opinions "insufficient such that causation [can] be resolved as a matter of law in this case."  Beckles, 160 N.H. at 130–31.  The court finds that Dr. Means' sufficiently reliable and admissible opinions on causation would permit a rational fact finder to conclude that the causal link between Lincare's alleged negligence and Mrs. Markovich's death probably existed.

Finally, Lincare argues in its reply brief that equating "likely" to "reasonable probability" requires too great an inferential leap and renders Dr. Means' opinion speculative, and thus, insufficient to establish causation.[10]  See Daubert, 509 U.S. at 590 (scientific knowledge "connotes more than subjective belief or unsupported speculation"); Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 81 (1st Cir.1998) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.") (citation and internal quotation marks omitted).

---

[10] Lincare Reply (doc. no. 48), at 3.

The court disagrees. The plaintiff grounds its causation theory on more than just Dr. Means' say so. To confirm this finding and because Dr. Means' sworn statement and deposition testimony were somewhat muddled,[11] however, the court asked the parties to make Dr. Means available for testimony at the summary judgment hearing. Dr. Means appeared at the hearing by videoconference platform. The court offered plaintiff's counsel the opportunity to question Dr. Means first, but he declined, allowing Lincare's counsel to proceed. Under questioning from Lincare's counsel, Dr. Means repeatedly testified that in her opinion it was more likely than not that an available suction machine would have removed the mucous plug or at least disturbed the plug in such a way, and in sufficient time, to clear Mrs. Markovich's airway and permit her survival. Consistent with her deposition, she refused to assign a specific percentage chance of survival to Mrs. Markovich, but explained that it was greater than 50 percent. This testimony confirmed and clarified Dr. Means' written opinions and was sufficient to defeat Lincare's summary judgment motion.

---

[11] Specifically, Dr. Means' deposition testimony could have been understood to suggest one of two ideas: (a) that she was unwilling to assign *any probability whatsoever* to Mrs. Markovich's survival had the device been timely delivered, or (b) that the probability was *greater than 50%*, but she was unwilling to choose a specific likelihood between 50% and 100%. To avoid the possibility of summoning an entire jury venire and drawing a jury only to grant a Rule 50 defendant's verdict as a matter of law if her opinion at trial was the former as opposed to the latter, the court required Dr. Means' testimony at a pretrial hearing on this motion in order to eliminate any ambiguity. At the hearing, Dr. Means testified to the latter idea.

## IV.    Conclusion and fee order

For the reasons set forth above, Lincare's motion for summary judgment[12] is DENIED.  As previously discussed, however, the court orders plaintiff's counsel to pay Lincare its attorneys' fees and costs incurred in drafting the portion of its prior summary judgment motion relating to causation.  Counsel shall attempt to reach agreement on the precise amount of such fees and costs and file a stipulation with this court within 14 days of the date of this order.

SO ORDERED.

_____
Joseph N. Laplante
United States District Judge

Dated: July 29, 2022

cc:    Counsel of Record

---

[12] Doc. no. 45.